UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:20-CR-42-HAB-SLC |
| | ) | |
| ADAM D. McGIBNEY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF HIS PENDING
MOTIONS TO SUPPRESS REGARDING STOP OF AUTOMOBILE, STATEMENTS
OBTAINED IN VIOLATION OF DEFENDANT'S RIGHTS UNDER *MIRANDA V.
ARIZONA* AND EVIDENCE SEIZED AS A RESULT OF EXECUTING WARRANT ON
DEFENDANT'S CELL PHONE**

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................... ii

ISSUE STATEMENT .......................................................................................................... vi

I.   Procedural History ................................................................................................ 1

II.   Background Facts Related to Pending Motions ............................................... 2

    A.   Facts relevant to motion to suppress regarding stop of Mr. McGibney's automobile ......................................................................................................... 2

    B.   Facts relevant to motion to suppress regarding *Miranda* violation. ...................... 6

    C.   Facts related to search and seizure of data from Mr. McGibney's cell phone. ................................................................................................................. 8

III.   Significant issues arose during the testimony of Trooper Youpel such that his credibility is severely tainted and should result in Mr. McGibney's motion to suppress regarding the stop of his automobile being granted. ........................... 9

    A.   The testimony of Trooper George Youpel should be given no credibility by this Court ............................................................................................................. 9

    B.   Adam McGibney's testimony, conversely, should be found not only believable but convincing by the Court. ............................................................. 12

IV.   The Traffic Stop of Mr. McGibney's Automobile by Trooper Youpel Violated His Rights Under the Fourth Amendment ....................................................... 13

V.   The Questioning of Mr. McGibney by SA Anderson Violated His Rights Under *Miranda v. Arizona* and, as such, Any Statement Obtained Should be Suppressed. ................................................................................................................ 20

    A.   Mr. McGibney's Request for Counsel was Unambiguous ................................... 21

VI.   The Search and Seizure of Data Contained on Mr. McGibney's Cell Phone Was Overbroad and, as such, Data Seized Should be Suppressed ........................... 24

VII.   Application of the Exclusionary Rule ............................................................. 26

VIII.   Conclusion and Prayer for Relief ................................................................... 27

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Arizona v. Evans,*
    514 U.S. 1 (1995) ...............................................................................................26

*Bram v. United States,*
    168 U.S. 532 (1897) .........................................................................................26

*Brendlin v. California,*
    551 U.S. 249 (2007) .........................................................................................14

*Brown v. Illinois,*
    423 U.S. 590 (1975) .........................................................................................26

*Connecticut v. Barrett,*
    479 U.S. 523 (1987) .........................................................................................21

*Davis v. United States,*
    512 U.S. 452 (1994) ...................................................................................21, 23

*Edwards v. Arizona,*
    451 U.S. 477 (1981) ...................................................................................20, 21

*Elkins v. United States,*
    364 U.S. 206 (1960) .........................................................................................26

*Hessel v. O'Hearn,*
    977 F.2d 299 (7th Cir. 1992) ............................................................................25

*Horton v. California,*
    496 U.S. 128 (1990) .........................................................................................24

*Kentucky v. King,*
    563 U.S. 452 (2011) .........................................................................................25

*Maryland v. Garrison,*
    480 U.S. 79 (1987) ...........................................................................................25

*Miranda v. Arizona,*
    384 U.S. 436 (1966) .................................................................................1, 20, 27

*Nardone v. United States,*
    308 U.S. 338 (1939) .........................................................................................27

*Pierson v. O'Leary,*
    959 F.2d 1385 (7th Cir. 1992) ..........................................................................13

*Riley v. California*,
   573 U.S. 373 (2014) ........................................................................................24

*Silverthorne Lumber Co. v. United States*,
   251 U.S. 385 (1920) ........................................................................................27

*Simmons v. United States*,
   390 U.S. 377 (1968) ..........................................................................................2

*State v. Adam D. McGibney*,
   Case No. 44D01-2007-CM-000261 ...................................................................7

*Subdiaz-Osorio v. Humphreys*,
   947 F.3d 434 (7th Cir. 2020) .........................................................................21

*United States v. Bandy*,
   2009 U.S. Dist. LEXIS 95466 (N.D. Ind. Oct. 13, 2009) ...............................11

*United States v. Bishop*,
   910 F.3d 335 (7th Cir. 2018) .........................................................................24

*United States v. Cashman*,
   216 F.3d 582 (7th Cir. 2000) .........................................................................14

*United States v. Cellitti*,
   387 F.3d 618 (7th Cir. 2004) .........................................................................20

*United States v. Dickerson*,
   530 U.S. 428 (2000) ........................................................................................20

*United States v. Galpin*,
   720 F.3d 436 (2d Cir. 2013) ...........................................................................25

*United States v. Hampton*,
   675 F.3d 720 (7th Cir. 2012) .........................................................................21

*United States v. Harvey*,
   2010 U.S. Dist. LEXIS 83052 (N.D. Ind. Aug. 13, 2010) .............................9, 10

*United States v. Hunter*,
   708 F.3d 938 (7th Cir. 2013) ......................................................................20, 21

*United States v. James*,
   113 F.3d 721 (7th Cir. 1997) .........................................................................20

*United States v. Jerez*,
   108 F.3d 684 (7th Cir. 1997) .........................................................................20

*United States v. Linear*,
 2008 U.S. Dist. LEXIS 80561 (N.D. Ill. Oct. 8, 2008).........................................11

*United States v. Lee*,
 413 F.3d 622 (7th Cir. 2005) .........................................................................23

*United States v. LeShore*,
 543 F.3d 935 (7th Cir. 2008) .........................................................................20

*United States v. Lewis*,
 920 F.3d 483 (7th Cir. 2019) .........................................................................14

*United States v. Liu*,
 239 F.3d 138 (2d Cir. 2000).........................................................................25

*United States v. Matias*,
 836 F.2d 744 (2d Cir. 1988).........................................................................25

*United States v. Mayorga*,
 2016 U.S. Dist. LEXIS 82185 (N.D. Ill. June 24, 2016) .........................................13

*United States v. Peters*,
 743 F.3d 1113 (7th Cir. 2014) .........................................................................14

*United States v. Rogers*,
 2006 U.S. Dist. LEXIS 98964 (S.D. Ind. Dec. 20, 2006).........................................15

*United States v. Simon*,
 937 F.3d 820 (7th Cir. 2019) .........................................................................9, 12

*United States v. Thurman*,
 889 F.3d 356 (7th Cir. 2018) .........................................................................20

*United States v. Whitley*,
 249 F.3d 614 (7th Cir. 2001) .........................................................................11

*United States v. Williams*,
 2009 U.S. Dist. LEXIS 101961 (N.D. Ill. Nov. 3, 2009).........................................11

*United States v. Wysinger*,
 683 F.3d 784 (7th Cir. 2012) .........................................................................23, 24

*Utah v. Streiff*,
 136 S. Ct. 2056 (2016).........................................................................26

*Whren v. United States*,
 517 U.S. 806 (1996).........................................................................14

*Wong Sun v. United States*,
    371 U.S. 471 (1963)................................................................................................27

**Statutes**

26 U.S.C. §§ 5841, 5861(d) and (e)............................................................................8

Ind. Code § 9-21-8-24(3).....................................................................................4, 10

Indiana Code § 9-21-8-25........................................................................................17

**Other Authorities**

United States Const., amend. IV..............................................................13, 14, 25, 26

United States Const., amend. V.................................................................................26

## ISSUE STATEMENT

I.      Whether the traffic stop of Mr. McGibney's vehicle by Probationary Trooper Youpel on July 19, 2020 violated Mr. McGibney's Fourth Amendment right against unreasonable seizures.

II.     Whether the custodial interrogation of Mr. McGibney by Special Agent Anderson on July 20, 2020 violated Mr. McGibney's rights under *Miranda v. Arizona* and the Fifth Amendment.

III.    Whether the government's search of Mr. McGibney's phone was overbroad and violated Mr. McGibney's Fourth Amendment right against unreasonable searches.

I.      Procedural History

Adam McGibney is presently before the Court on three pending motions to suppress. His initial Motion to Suppress Regarding Stop of Automobile was filed on October 16, 2020. [Dkt. 28]. Mr. McGibney's Motion to Suppress Alleged Statements Obtained in Violation of Defendant's Rights Under *Miranda v. Arizona* and Related Constitutional Guarantees was filed the same day. [Dkt. 29]. Mr. McGibney's third motion was a Motion to Suppress Evidence Seized as a Result of Executing Warrant on Defendant's Phone. This motion was filed on October 27, 2020. [Dkt. 32].

On November 2, 2020, the government filed its response to Mr. McGibney's motions regarding the stop of his automobile and statements taken from him by ATF Agent Caleb Anderson. [Dkt. 35]. The government filed its response to Mr. McGibney's third motion to suppress related to its search of his cell phone on November 12, 2020. [Dkt. 39]. Thereafter, the Court entered an Order on November 18, 2020 setting an evidentiary hearing on Mr. McGibney's motions to suppress for December 2, 2020. [Dkt. 42]. On November 24, 2020, the government filed an unopposed motion to continue the evidentiary hearing [Dkt. 43] which the Court granted, rescheduling hearing on Mr. McGibney's motions for January 21, 2021. [Dkt. 44]. On January 11, 2021, the government filed its second motion to continue evidentiary hearing on Mr. McGibney's pending motions due to a scheduling conflict involving necessary witness ATF Agent Caleb Anderson. [Dkt. 50]. At a status hearing scheduled by the Court for January 14, 2021, the government's motion was granted and hearing was reset for February 12, 2021. [Dkt. 52].

On February 11, 2021, the parties filed a stipulation regarding the admission of certain exhibits for the then pending hearing on Mr. McGibney's motions to suppress. [Dkt. 60 and 63]. On February 12, 2021, the parties appeared for evidentiary hearing in this matter. During the

1

hearing held, the government called the following witnesses: Indiana State Trooper George Youpel; ATF Special Agent Caleb Anderson; and ATF Special Agent Thomas Kaiser. The defense then presented the testimony of Adam McGibney pursuant to *Simmons v. United States*, 390 U.S. 377, 389-94 (1968), for the purpose of addressing factual issues related to the stop of his automobile. (H.T.[1] 160:12-15).

II.       Background Facts Related to Pending Motions

Facts established during the suppression hearing held in this matter confirm the basis upon which the Court should grant Mr. McGibney's pending motions.

A.       Facts relevant to motion to suppress regarding stop of Mr. McGibney's automobile.

1.   Testimony of Indiana State Trooper George Youpel

Probationary Trooper George Youpel is a young officer who, at the time of Mr. McGibney's traffic stop on July 19, 2020, had limited field experience with the Indiana State Police ("ISP"). Before his time with ISP, Trooper Youpel worked for two years as a deputy with the Steuben County Sheriff's Office. He spent three months of his time there in basic training. (H.T. 38:1-5). Upon joining ISP, he underwent six more months of training. After graduating from the ISP Academy in December 2019, Trooper Youpel entered a three-month field-training phase where he was under the direct supervision of another officer. (H.T. 10:12-16). Upon completion, he entered a one-year probation period. During this probationary period, his reports were thoroughly reviewed by his supervising officers, the lieutenant, the first sergeant, and the district supervisor. (H.T. 10:19-25). In his position with ISP, Trooper Youpel rides by himself, without a partner, without a dash-camera, and without a body-camera. (H.T. 12:9-18).

---

[1] "H.T." refers to the hearing transcript of testimony received by the Court on February 12, 2021.

On July 19, 2020, Trooper Youpel, only a few months into his probationary period, was working the midnight shift on the Indiana Toll Road. (H.T. 11:10-11). Close to midnight, while patrolling outside his assigned zone, Trooper Youpel pulled over Mr. McGibney for an alleged unsafe lane movement while passing a semi tractor-trailer. (H.T. 38:9-20; 14:14-18). Trooper Youpel recounted the events of this stop and Mr. McGibney's subsequent arrest in his July 20, 2020 report and testified regarding the same at the February 12, 2021 suppression hearing. Trooper Youpel's testimony, however, made it clear that he either could not accurately recall the events of July 19, 2020 or was giving less than candid answers.

Trooper Youpel gave inconsistent testimony as to where he was when he first saw Mr. McGibney's vehicle. He testified that he could not recall where his vehicle was located when he first saw Mr. McGibney's vehicle. (H.T. 38:21-23). He could not recall whether he was driving or in the median of the interstate when he first saw Mr. McGibney's vehicle. (H.T. 38:24-25). When asked if he could have been in the median when he first observed the vehicle, Trooper Youpel responded, "I could have." (H.T. 39:1-2). Later, after further questioning, he changed his answer, stating that he was "driving eastbound" when he noticed the vehicle. (H.T. 40:23-25). When asked, he could not recall where he was in relation to Mr. McGibney when he witnessed the first alleged infraction (the right-to-left lane change) as Mr. McGibney was passing a slow moving semi-tractor trailer. He could not recall whether he was directly behind the vehicle or in the left lane. (H.T. 43:16-17). He confirmed that his report did not answer that question. (H.T. 43:18-19).

Trooper Youpel then gave inconsistent testimony as to where his vehicle was when he witnessed the second (left-to-right) lane change after McGibney passed the semi. At first he testified that he was still behind the semi-trailer at this point. (H.T. 53:9-11). If he was still behind the trailer when Mr. McGibney was signaling, it seems implausible for him to have a direct view

of the vehicle's turn signal turning off before crossing back into the right lane or that it was "very quick." (H.T. 53:6-7). Later, Trooper Youpel changed his testimony, saying he was not behind the trailer, instead he was "guessing [he] would have been in the left lane" at that point. (H.T. 81:13-14).

Significantly, Trooper Youpel once again gave inconsistent testimony regarding how he determined Mr. McGibney did not signal for 300 feet during each lane change move made as part of passing the semi. Trooper Youpel's testimony focused heavily on whether Mr. McGibney signaled for more at least 300 feet prior to making his lane changes. (*See, e.g.*, H.T. 15:25; 16:1-3). He testified that he usually looks at "lane divider spaces or . . . landmarks on the side of the road" to judge the distance a car has traveled with its turn signal on. (H.T. 55:20-24). But he then testified that he kept his eyes on Mr. McGibney's vehicle the whole time. (H.T. 56:13-18). At no point did Trooper Youpel explain what "landmarks" he was referring to; the distance between lane dividers; or how any of these things led him to any distance determination as to how long Mr. McGibney's turn signals were activated.

In addition, the code section Trooper Youpel cited in his warning to Mr. McGibney, and the reasoning for his stop, was Ind. Code § 9-21-8-24(3). (H.T. 42:16-18). But that section has no 300-feet signaling requirement, something Trooper Youpel admitted at the hearing. (H.T. 44:9-25; 45:1-25; 46:1-14). He further admitted that, based on the text of the statute, Mr. McGibney did not violate § 9-21-8-24(3) or the other sections it incorporates. (H.T. 47:1-6). The only reason he could offer for using this incorrect statute was that he was instructed to do so, apparently even in situations where that statute is not actually applicable. (H.T. 79:3-11).

4

2.   Testimony of Adam McGibney

At the time of his arrest in this matter, Mr. McGibney was residing in Los Angeles, California with his aunt and uncle. (H.T. 161:16-18). Unlike Probationary Trooper Youpel, Mr. McGibney's memory of the events surrounding the stop of his automobile is very clear.

On July 19 at around 11:50 p.m. Mr. McGibney was driving a 1993 Lincoln Town Car eastbound on the Indiana Toll Road in LaGrange County, Indiana. (H.T. 161:19-24). He was alone in his car and part of a group of cars traveling eastbound on the Toll Road, a four-lane highway with two lanes in each direction, east and west. (H.T. 161:25; 162:1-9). The speed limit in LaGrange County was 70 miles per hour. (H.T. 162:10-12). We know from the testimony of Trooper Youpel that Mr. McGibney was not exceeding the posted speed limit. (H.T. 39:14-17).

As Mr. McGibney was driving eastbound he noticed a police cruiser sitting in the median of the highway. As he passed it, Mr. McGibney saw Trooper Youpel's fully marked cruiser pull out behind him. (H.T. 162:13-24; 163:1-3). Conversely, Trooper Youpel could not recall where his cruiser was located when he first made visual contact with Mr. McGibney's car. He could not recall if it was in the median of the highway. (H.T. 38:21-25). Mr. McGibney recalled specifically that Trooper Youpel followed him for about 10 minutes, a little over 10 miles at 70 miles per hour. (H.T. 163:9-12). Trooper Youpel, conversely, could not recall how long he followed Mr. McGibney before effecting the traffic stop and made no note regarding this issue in his report of the incident. (H.T. 40:11-16).

As Mr. McGibney was heading eastbound on the Toll Road, there came a point where the group of vehicles he was part of approached a slower moving semi-tractor trailer also heading eastbound. (H.T. 163:19-22). While approaching the slower moving semi, Mr. McGibney made the decision to pass it. (H.T. 163:23-25). Knowing Trooper Youpel was a few car lengths behind

him, Mr. McGibney made sure to use his turn signal during both his movement from the right eastbound lane into the left lane and again, after passing the semi, moving from the left eastbound lane back into the right lane. (H.T. 164:1-10). In doing so, Mr. McGibney had his turn signal activated for at least 6 seconds during each maneuver. (H.T. 164:11-25; 165:1-3). It is important to note that Mr. McGibney has never received a traffic ticket for improper use of his turn signal in any manner. (H.T. 165:8-11).

The government's cross-examination of Mr. McGibney did nothing to shake the credibility of his direct examination testimony. During government questioning, he confirmed his memory of events at issue as it was the only time he had been pulled over during his trip across the country from Los Angeles. (H.T. 167:2-25; 168:1-24). Being pulled over by Trooper Youpel, arrested and put in jail for the first time in his life was a highly stressful sequence of events which Mr. McGibney had every reason to recall in detail. (H.T. 113:24-25; 114:1-3; 168:20-24). As Mr. McGibney perhaps best described his ability to recall the events related to the traffic stop, ". . . this has been a rather remarkable driving event." (H.T. 173:6-7).

B.     Facts relevant to motion to suppress regarding *Miranda* violation.

After being arrested by an inexperienced officer on incorrect charges, Mr. McGibney's clear request for an attorney the following day was denied by ATF Special Agent Caleb Anderson. In the middle of the night of July 20, 2020, SA Caleb Anderson received a phone call from Indiana State Police Corporal Grant Crabtree regarding the traffic stop of Mr. McGibney on the Indiana Toll Road. (H.T. 90:8-25; 91:1-11). Later that morning, SA Anderson received Trooper Youpel's report and photos from the arrest, and immediately realized that the "fairly new" Trooper Youpel (H.T. 92:16) had arrested Mr. McGibney for two offenses that "were not valid charges." (H.T. 91:21). Realizing the obviousness of Trooper Youpel's error, SA Anderson subsequently called the LaGrange County prosecutor "to let him know those two charges [were] not good," because

6

"the prosecutor wasn't familiar with" the problems with the rifle and body armor charges either. (H.T. 92:1-3). SA Anderson acknowledged that the only potentially valid charge against Mr. McGibney was carrying a handgun without a license.[2] (H.T. 91:23-25).

With full knowledge that Mr. McGibney's arrest was made by an inexperienced officer and that the arresting charges were based on several mistakes of law, SA Anderson conducted a custodial interview of Mr. McGibney at the LaGrange County Jail the afternoon after Mr. McGibney's late-night arrest. Mr. McGibney had been pulled over in his vehicle around midnight the previous night, and was booked in the LaGrange County Jail in the early morning hours of July 20, 2020. (H.T. 13:7-9; 35:2-5). SA Anderson introduced himself to Mr. McGibney and suggested he was there to clear up the mistaken charges that SA Anderson knew to be invalid as a matter of law:

> SA Anderson:    "I got called—there was some confusion I think—the trooper that stopped you may be charging you with some things you shouldn't be charged with. . ."

(Custodial Interview at 3:44).

After introductions and before SA Anderson began questioning Mr. McGibney, Mr. McGibney specifically asked: "When can I get a lawyer?" (Custodial Interview at 4:44). SA Anderson side-stepped the question, responding that Mr. McGibney could get a lawyer "whenever you want one" and immediately pressed on to inquire if Mr. McGibney was ready to answer his questions. (Custodial Interview at 4:46). In response, Mr. McGibney stated that it would "depend on the questions." (Custodial Interview at 4:48). Mr. McGibney never explicitly waived his *Miranda* rights, and never signed a form or notice waiving those rights. (H.T. 115:7-22).

---

[2] The charge of carrying a handgun without a license was dismissed with prejudice by the LaGrange Superior Court on September 21, 2020. *See State v. Adam D. McGibney*, Case No. 44D01-2007-CM-000261, LaGrange Superior Court.

SA Anderson has nearly 15 years of experience in law enforcement, while Mr. McGibney had no criminal history or previous interaction with law enforcement (H.T. 86:12-13; 113:24-25; 114:1-3). Before interviewing Mr. McGibney, SA Anderson did not ask Mr. McGibney if he had slept at all the night before, whether he felt well, or the last time he had had something to eat or drink. (H.T. 114:4-21). At the time of his arrest, Mr. McGibney had been residing in California and was driving cross-country to return to his former home in New York. (H.T. 17:17-23; 161:16-18). There is nothing in the record to suggest that Mr. McGibney had ever resided in Indiana before he set out to traverse the state on July 19, 2020. Finding himself in an unknown state and under arrest for two invalid charges, Mr. McGibney clearly requested an attorney when interviewed by SA Anderson the following day.

C.  Facts related to search and seizure of data from Mr. McGibney's cell phone.

During the arrest of Mr. McGibney, his cell phone was seized by the Indiana State Police and placed into jail property at the LaGrange County Jail. SA Anderson retrieved the phone from jail staff. (H.T. 103:13-21). Thereafter, SA Anderson sought and secured a search warrant allowing for the seizure of evidence contained on the phone regarding firearms, messages about the sale, purchase of the short-barrel rifle at issue. (H.T. 104:2-5 and Hearing Exhibit 2). More precisely, Attachment B to Exhibit 2 limited those items which could be seized from the cell phone to records related to the violation of 26 U.S.C. §§ 5841, 5861(d) and (e) from 2018 through July 20, 2020 involving Mr. McGibney and other firearm related information.

After retrieving Mr. McGibney's cell phone and obtaining the warrant to search its contents, SA Anderson gave the phone to ATF Special Agent Tom Kaiser ("SA Kaiser") who performs phone downloads for ATF. (H.T. 104:14-21). SA Anderson did not search the phone prior to providing it to SA Kaiser. (H.T. 105:7-9). SA Kaiser performed a comprehensive bit-for-bit physical extraction of all data on Mr. McGibney's phone. (H.T. 131:2-9; 134:6-25). Per SAs

Anderson and Kaiser, ATF seized multiple items that were not responsive to the search warrant authorization it had received when downloading the phone's contents. (H.T. 110:3-17; 146:1-14).

III.     Significant issues arose during the testimony of Trooper Youpel such that his credibility is severely tainted and should result in Mr. McGibney's motion to suppress regarding the stop of his automobile being granted.

A.     The testimony of Trooper George Youpel should be given no credibility by this Court.

In its February 17, 2021 order granting Mr. McGibney's release from detention, this Court expressed it has "grave concerns" about Trooper Youpel's credibility. [*See* Dkt. 70 at 5]. The Court's grave concerns are well-founded given Trooper Youpel's inconsistent, unsupported, and uncorroborated testimony at the suppression hearing.

Considering the totality of Trooper Youpel's testimony at the suppression hearing, the Court should find his contradictory version of events incredible. *See United States v. Simon*, 937 F.3d 820, 831 (7th Cir. 2019) (the court considers the officer's testimony, demeanor, and appearance when determining credibility). As previously shown, Trooper Youpel struggled to consistently describe or recall the events of the stop and subsequent arrest, requiring counsel to repeat questions several times. Trooper Youpel stated that he did not "recall" or could not remember vital facts of that evening at least a dozen times throughout his testimony. His events of that evening are uncorroborated by his own report, any recording, or other officer testimony. Most importantly, he could not justify the reported reason for his stop. He could not explain how Mr. McGibney violated the statute for which he was issued a warning. Instead, Trooper Youpel pointed the blame for the incorrect citation on others despite spending six months at the ISP academy, where he was instructed in traffic law. (H.T. 9:4-10).

This case is not unlike *United States v. Harvey*, 2010 U.S. Dist. LEXIS 83052, at *14-15 (N.D. Ind. Aug. 13, 2010). In *Harvey*, the officer only reported he pulled the defendant over

"because a bracket partially obstructed the license plate's registration." But the bracket did not violate Indiana law. *Id.* At the suppression hearing, the officer "suddenly suggested that the malfunctioning license plate lights was the main reason for pulling Harvey over all along." The Court refused to credit this explanation given the officer's inconsistent testimony. *Id.* In light of his conflicting testimony, the Court questioned the credibility of the officer's testimony that he smelled marijuana coming from the vehicle. *Id.*

Trooper Youpel's testimony in this case is reminiscent of the officer in *Harvey*, with Trooper Youpel providing inconsistent, incomplete, or non-responsive answers that discredit his telling of events. Trooper Youpel only issued Mr. McGibney a warning under Ind. Code § 9-21-8-24(3). But, as Trooper Youpel conceded, Mr. McGibney did not violate § 9-21-8-24(3). Instead, Trooper Youpel focused his testimony on whether Mr. McGibney signaled continuously for 300-feet; but his testimony is filled with internal conflicts and inconsistencies. This Court should be similarly incredulous like the *Harvey* court to the suggestion that Trooper Youpel—who could not confidently or consistently remember which lanes he was in or whether he was behind a trailer when witnessing the lane-change—was able to simultaneously keep his focus on the Lincoln *and* measure 300-feet using landmarks. *Harvey*, 2010 U.S. Dist. LEXIS 83052 at *14-15 ("In fact, [the officer] testified that when he pulled behind Harvey's truck at 3:25 a.m., he could not read the license plate because it was too dark. Yet at the same time he wants me to believe he could somehow see that a black bracket covered a single registration number in the top right corner of the plate. I don't buy it.").

There is no corroborating evidence to save Trooper Youpel's inconsistencies. His report lacks important information, such as the 300-feet measurement. Trooper Youpel does not wear a body-camera nor is his vehicle equipped with a dash-camera, so there is no recorded evidence of

10

Mr. McGibney's allegedly improper lane changes. Finally, there is no officer testimony that corroborates this account. *Cf. United States v. Bandy*, 2009 U.S. Dist. LEXIS 95466, at *14 (N.D. Ind. Oct. 13, 2009) (finding an officer's testimony more credible because it was corroborated by another testifying officer). Even if Probationary Trooper Zachary McKenzie had testified, he arrived on scene well after the lane-changes and much of the interaction between Mr. McGibney and Trooper Youpel. (H.T. 21:3-6).

A credibility determination is based on the totality of the evidence. *United States v. Whitley*, 249 F.3d 614, 624 (7th Cir. 2001). Therefore, if an officer is found incredible in one aspect of his testimony, it can "cast[] an entirely different light" on the credibility of other aspects of his account. *See id.* ("We refuse the government's invitation to consider the officers' credibility regarding the preparation of the affidavit in isolation, divorced from a consideration of their lack of credibility in connection with the entry into Room 421."). The same is true here. Trooper Youpel's account of the alleged infractions giving him probable cause to pull over and detain Mr. McGibney is inconsistent, unsupported, and uncorroborated; this colors his credibility, or lack thereof, throughout his testimony regarding all the events of that night. *See, e.g.*, *United States v. Williams*, 2009 U.S. Dist. LEXIS 101961, at *11-15 (N.D. Ill. Nov. 3, 2009) (finding an officer's less than candid response for why he made the traffic stop influenced his credibility when he testified as to the drugs in plain view that purportedly supported his search of the vehicle); *United States v. Linear*, 2008 U.S. Dist. LEXIS 80561, at *3 (N.D. Ill. Oct. 8, 2008) (noting the Court's disbelief, after already finding the officer's initial reason for the stop to be incredible, of "the ubiquitous license-plate-light-out violation that is sometimes offered by traffic officers to bolster an otherwise shaky position").

This Court has already noted the serious credibility issues arising from Trooper Youpel's testimony. Trooper Youpel's less than candid testimony, in addition to his convenient forgetfulness throughout the hearing, should lead this Court to find his testimony incredible. *See Simon*, 937 F.3d at 831 (the court considers the totality of the officers' testimony, demeanor, and appearance when determining credibility). The Court should not give weight to Trooper Youpel's version of events from July 19 and 20, 2020, especially when Mr. McGibney, a credible witness, has provided consistent and believable facts.

B.   Adam McGibney's testimony, conversely, should be found not only believable but convincing by the Court.

As opposed to Trooper Youpel's testimony, Mr. McGibney's account of the July 19, 2020 traffic stop is consistent and credible. Mr. McGibney has no criminal record; he has never been arrested; Mr. McGibney has never even received a ticket for improper use of a turn signal before this event. (H.T. 113:24-25; 114:1-3; 165:8-11). There is nothing in his record that would indicate a reason to mistrust Mr. McGibney—it actually provides just the opposite.

His testimony reliably filled in the gaps of Trooper Youpel's inconsistent answers. Mr. McGibney noted Trooper Youpel's cruiser sitting in the median of the highway; after passing, Trooper Youpel pulled out behind Mr. McGibney and followed him and a group of cars for approximately ten miles, details Trooper Youpel and his report could not answer. (H.T. 38:21-25; 40:11-16, 162:2-25; 163:1-18). When describing his pass around the trailer, Mr. McGibney clearly explained the position of his vehicle compared to Trooper Youpel's vehicle and his cautious use of turn signals for each lane change. (H.T. 163:19-25; 164:1-25; 165:1-3). Compare this to Trooper Youpel's inconsistent retelling of those same events, unaware of which lane his vehicle was in or whether a tractor-trailer was between him and Mr. McGibney's vehicle during the second lane

12

change. (H.T. 43:11-20; 53:6-11). Throughout his questioning, Mr. McGibney was calm and directly answered questions compared to Trooper Youpel's frustration and evasive answers.

The government's attempt to discredit Mr. McGibney's clear and consistent testimony was futile. Whether Mr. McGibney can remember mundane events during a cross-country venture, such as where he stops for gas every 200 miles or how many times he changed lanes, is inherently different from a person recalling the details surrounding a critical life event—*i.e.*, the one-and-only-time he was arrested and jailed. This seminal event stripped him of his liberty for months and has been the focus of his attention since. In truth, the government's cross-examination actually ended up doing the opposite of its intended effect—Mr. McGibney was able to remember many other details from his cross-country road trip (*e.g.*, how often he fueled up, what time of day he departed, which rest area he stayed at). (*See* H.T. 166-68). Importantly, Mr. McGibney was able to recall seeing at least two other police cruisers while traveling through Iowa. (H.T. 169:17-25).

There is no reason to doubt Mr. McGibney's account of the July 19, 2020 traffic stop. Mr. McGibney's responses were never evasive or contradictory. *Cf. United States v. Mayorga*, 2016 U.S. Dist. LEXIS 82185, at *10 (N.D. Ill. June 24, 2016) (finding the defendant's "evasive manner while testifying and contradictory testimony reduced his credibility"). Trooper Youpel's inconsistent and less than candid responses should not overcome Mr. McGibney's credible and convincing testimony. *See, e.g.*, *Pierson v. O'Leary*, 959 F.2d 1385, 1393 (7th Cir. 1992) (finding the officers' denials of a defendant's account "should fall on deaf ears" given their testimony regarding defendant's seizure "was less than truthful").

IV.     The Traffic Stop of Mr. McGibney's Automobile by Trooper Youpel Violated His Rights Under the Fourth Amendment

The traffic stop of Mr. McGibney by Probationary Trooper Youpel was an unreasonable seizure of Mr. McGibney and violated his Fourth Amendment rights. At the evidentiary hearing

held on February 12, 2021, Trooper Youpel's testimony was the only evidence offered by the government to support the basis for Mr. McGibney's traffic stop. In the Court's February 17, 2021 order granting Mr. McGibney's release from detention, the Court expressed "grave concerns" about the credibility of Trooper Youpel. Significant issues arose during the testimony of Trooper Youpel, including contradictions in his hearing testimony, such that the hearing testimony provided by Trooper Youpel is unsupported and severely tainted. Because there is no credible, reasonable evidence to support the traffic stop of Mr. McGibney by Trooper Youpel, Mr. McGibney's motion to suppress regarding the traffic stop of his automobile should be granted.

The Fourth Amendment protects individuals from "unreasonable searches and seizures." United States Constit., amend. IV. A traffic stop for a suspected violation of law is a "seizure" of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 255-59 (2007). Generally, the decision to stop a car is reasonable, and comports with the Fourth Amendment, "where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). Probable cause exists when "the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense." *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000). Probable cause is an objective standard, based on the totality of the circumstances. *United States v. Lewis*, 920 F.3d 483, 489 (7th Cir. 2019). Finally, the government bears the burden of proving by a preponderance of the evidence that reasonable suspicion supported the traffic stop—the burden does not lie with Mr. McGibney. *See United States v. Peters*, 743 F.3d 1113, 1116 (7th Cir. 2014).

Where the officer initiating the arrest is not credible, there is "no probable cause for the stop in the first place." *United States v. Rogers*, 2006 U.S. Dist. LEXIS 98964, at *15 (S.D. Ind.

14

Dec. 20, 2006). In *Rogers*, Indianapolis police officer Gorgievski initiated a traffic stop for automobile, ostensibly for an expired license plate. *Id.* at *1. The traffic stop led to a pat-down, which revealed a hidden revolver in Mr. Rogers' pants. *Id.* However, the Court concluded that the traffic stop was pretextual because of "contradictions between Officer Gorgievski's different versions" of events. *Id.* at *16. Officer Gorgievski stated that he saw "expired stickers" on Rogers' license plate, but there was no evidence that he conducted a computer check of the license plate or received an erroneous message that the license plate was expired. *Id.* at *17. At bottom, the court simply found that Officer Gorgievski's account was "not credible." *Id.*

In this case, for the reasons discussed in Section II.A.1 above, the testimony of Probationary Trooper Youpel should be given no credibility by this Court. Trooper Youpel testified at the February 12, 2021 hearing that he pulled over Mr. McGibney for two alleged traffic violations.

First, Trooper Youpel stated that he "observed that [McGibney's] vehicle was in the right-hand lane behind a semi tractor-trailer," and that "[a]pproximately halfway through the time that the vehicle was making its lane change, it activated its turn signal going into the left lane." (H.T. 14:17-21). Yet despite testifying that he observed Mr. McGibney making the lane change and allegedly failing to activate his turn signal until he was already in the middle of the lane divider, Trooper Youpel had no recollection of his location leading up to the alleged infraction:

> Q:   Where was your vehicle located when you first had visual contact with the car being driven by Mr. McGibney?
>
> A:   I don't recall.
>
> Q:   Were you in the median of the Toll Road?
>
> A:   I don't recall.
>
> Q:   Okay. Could you have been in the median of the Toll Road?

15

A:      I could have.

(H.T. 38:21-25; 39:1-2).

Q:      So basically you don't know how long you were following him [before executing the traffic stop]?

A:      I don't recall.

(H.T. 40:11-13).

Trooper Youpel subsequently contradicted his testimony that he did not know his location when he first made visual contact with Mr. McGibney's vehicle, stating he was not in the median and was traveling eastbound:

Q:      When you first laid eyes on Mr. McGibney's vehicle, does your report indicate where you were located, whether you were travelling eastbound or whether you were in the median?

A:      It says that I was on patrol traveling eastbound. So when I put in my report that I was traveling eastbound, or I was on patrol traveling eastbound, that means I was driving eastbound.

(H.T. 41:10-16). However, even after he contradicted his prior testimony and stated that he was travelling eastbound when he observed the alleged first infraction, Trooper Youpel could not remember if he was directly behind Mr. McGibney in the right lane or offset in the left lane:

Q:      Where were you in relationship to Mr. McGibney's vehicle when you claim to have observed this violation that caused you to pull him over?

A:      Behind him.

Q:      Directly behind him or offset in the left lane?

A:      Don't recall.

(H.T. 43:11-17). Trooper Youpel's account of Mr. McGibney's first alleged infraction is not credible. First, he testified that he did not know where he was when first viewed Mr. McGibney's vehicle and testified that he could have been in the median of the Toll Road. After viewing his

16

report, he testified that he was, in fact, traveling eastbound when he viewed Mr. McGibney's vehicle, but could not remember any other pertinent details, such as whether he was directly behind Mr. McGibney or diagonal to his vehicle in the left lane.

Second, Trooper Youpel stated that after Mr. McGibney had turned into the left lane and passed the semi tractor-trailer, he activated the "right turn signal, turned it off, and then made [his] lane change into the right lane" but that the lane change period "when he was activating his turn signal" was "not anymore than 300 feet." (H.T. 14:22-25; 15:1-2). As such, Trooper Youpel initially testified that Mr. McGibney did not signal for *more* than 300 feet before changing back into the right lane. However, Indiana Code § 9-21-8-25 states that a driver "shall give a signal continuously for *not less* than 300 feet" when travelling in a speed zone of at least 50 miles per hour. Ind. Code § 9-21-8-25 (emphasis added). Trooper Youpel subsequently changed his testimony in response to a leading question from the government:

> Q:   Let me ask you this: In either of those lane changes, did the driver of that vehicle signal continuously the intent to change lanes for 300 feet prior to making the lane change?
>
> A:   No, he did not.

(H.T. 15:25; 16:1-3). When asked how long Mr. McGibney signaled during the first alleged infraction, Trooper Youpel responded in terms of the number of clicks of the signal, and couldn't say how many seconds the signal was on:

> Q:   When he put the signal on moving from the right-eastbound lane to the left-eastbound lane, how long was the turn signal on until he completed the maneuver into the left lane?
>
> A:   I would say maybe 3 or 4 clicks.
>
> Q:   Three or 4 seconds?
>
> A:   Whatever the – I would say it was only on to the point to where it blinked 3 or 4 times.

(H.T. 52:1-7). Besides stating how many times the signal allegedly blinked, Trooper Youpel could provide no other basis for his conclusion that the amount of time the signal blinked was less than the time required to travel 300 feet. Trooper Youpel did not use a laser pointer or other device to measure distance, did not gauge the distance traveled by Mr. McGibney's car by reference to stationary landmarks, did not know approximately how many seconds it would take to traverse 300 feet for a vehicle traveling 70 miles per hour on the Toll Road, and had no dash-cam or body-cam video to corroborate his testimony. (H.T. 55:10-19; 56:13:20; 58:13-22; 60:1-9). Finally, Trooper Youpel's report does not state anything about the length of time the vehicle signaled when changing from the left lane back to the right lane. While he was given the opportunity to use his case report to refresh his memory about events that took place around Mr. McGibney's arrest during the hearing held, he was not able to point to his report as confirming his baseless accusation about how long Mr. McGibney had his turn signal flashing. Rather, the report solely indicated that Mr. McGibney turned off his signal before completing his return to the right lane, which Trooper Youpel admitted was not a violation of Indiana law. (H.T. 58:3-12).

Most shocking and egregious, Trooper Youpel displayed indifference to the factual and legal errors underlying his arrest of Mr. McGibney. Trooper Youpel admitted that he issued a warning to Mr. McGibney for violation of a statute that he did not violate:

> Q:    The statute you cited in your ticket isn't something he violated, correct, whether you normally write it that way or not; you wrote him for something he didn't do. He didn't violate 9-21-8-24, dash 27 or dash 28, did he?
>
> A:    I guess not.

(H.T. 47:1-6). This was not a clerical error or a transposition error in the statutory numbering. Trooper Youpel's only defense was that "that's the statute that we write for when . . . they don't use their turn signal properly or they are not driving in their lane properly." (H.T. 46:17-19). When

18

confronted with the clear error, Trooper Youpel was equivocal and indifferent. (H.T. 47:6 ("I guess not")).

Conversely, as discussed in Section II.A.2 above, Mr. McGibney's testimony was credible and should be found to be convincing by the Court. Mr. McGibney clearly testified that as he was driving eastbound when he noticed a police cruiser sitting in the median of the highway. As he passed it, Mr. McGibney saw Trooper Youpel's fully marked cruiser pull out behind him. (H.T. 162:13-24). Mr. McGibney recalled specifically that Trooper Youpel followed him for about 10 minutes, a little over 10 miles at 70 miles per hour. (H.T. 163:9-12). When approaching a slower-moving semi, and knowing a police car was a few car lengths behind him, Mr. McGibney made sure to use his turn signal during both his movement from the right eastbound lane into the left lane and again, after passing the semi, moving from the left eastbound lane back into the right lane. In doing so, Mr. McGibney had his turn signal activated for at least 6 seconds during each maneuver. Mr. McGibney has never received a traffic ticket for improper use of a turn signal, and his account of the events of July 19, 2020 are consistent and credible, particularly in light of the noted inconsistencies and contradictions in the report and testimony of Trooper Youpel.

Based on the foregoing facts and legal analysis, Mr. McGibney's motion to suppress the stop of his automobile should be granted by the Court and all evidence obtained by the government should be suppressed pursuant to the Fruit of the Poisonous Tree Doctrine. In addition, Mr. McGibney's consent, given during his unreasonable seizure, for Trooper Youpel to search his vehicle was tainted. In the context of a request to search a vehicle during a traffic stop, "[c]onsent given during an illegal detention is presumptively invalid." *United States v. Cellitti*, 387 F.3d 618, 622 (7th Cir. 2004); *see also United States v. Jerez*, 108 F.3d 684, 695 & n.13 (7th Cir. 1997) (there is a "strong body of case law in our circuit, as well as in other circuits" holding that consent

is tainted by illegal stops, detentions, or arrests). When consent to search is given by a person who remains illegally detained, the government is unlikely to meet its burden of showing that the consent was sufficiently attenuated from the illegality. *See Jerez*, 108 F.3d at 695.

V.      The Questioning of Mr. McGibney by SA Anderson Violated His Rights Under *Miranda v. Arizona* and, as such, Any Statement Obtained Should be Suppressed.

To protect an individual's right against self-incrimination, the Supreme Court held in *Miranda v. Arizona,* 384 U.S. 436 (1966), that a suspect must be advised of certain rights before being subjected to custodial interrogation. *See United States v. James,* 113 F.3d 721, 726 (7th Cir. 1997). In *United States v. Dickerson,* 530 U.S. 428 (2000), the Supreme Court confirmed *Miranda* as a constitutionally based decision. A valid *Miranda* waiver is necessary before a custodial statement may be admitted into evidence. *United States v. LeShore*, 543 F.3d 935, 941 (7th Cir. 2008). It is the government's burden to show by a preponderance of the evidence that a suspect voluntarily waived those rights. *United States v. Thurman*, 889 F.3d 356, 364 (7th Cir. 2018).

Under precedent of the Supreme Court, as interpreted in the Seventh Circuit, a suspect's request for counsel must be unambiguous to prevent further interrogation. *United States v. Hunter*, 708 F.3d 938, 942 (7th Cir. 2013) ("Once a court decides whether a defendant's request for counsel is ambiguous, the analysis is simple.").

If a suspect makes "an unambiguous invocation of his right to counsel," then the Supreme Court's holding in *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) controls: an "accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Hunter*, 708 F.3d at 942 (quoting *Edwards*, 451 U.S. at 484-85).

20

If a suspect instead makes a request for counsel that is ambiguous, then the Supreme Court's holding in *Davis v. United States*, 512 U.S. 452 (1994) controls: "if a reference is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, *Edwards* does not require that officers stop questioning the suspect." *Hunter*, 708 F.3d at 942 (quoting *Davis*, 512 U.S. at 452).

A.      Mr. McGibney's Request for Counsel was Unambiguous

Courts are required to evaluate a defendant's request "as ordinary people would understand it," and "to give a broad, rather than a narrow, interpretation to a defendant's request for counsel." *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987). "The law requires a clear expression of a present desire for an attorney." *Subdiaz-Osorio v. Humphreys*, 947 F.3d 434, 446 (7th Cir. 2020). The Seventh Circuit has focused on the actual words used by the suspect to determine if the request was unambiguous. In *Hunter*, the defendant "used the decisive word 'can' when he asked Detective Karzin to call his attorney. In contrast, the defendant in *Davis* used the indecisive words 'maybe' and 'should.' 'Maybe' means only 'perhaps' or 'possibly,' while 'should' is 'used to . . . ask advice or suggestions." *Hunter*, 798 F.3d at 944. In *Hunter*, the court also relied on the context that the interrogation had already begun to find the request unambiguous, after the detective had asked Hunter if he was willing to speak about the incident. *See id.* The Seventh Circuit has often "looked to prior context when determining whether a defendant unambiguously invoked his right to counsel." *Id.* at 945. For example, where a defendant repeatedly went back and forth on whether he wanted counsel, a later request using the "hedge word 'but'" was found to be ambiguous. *United States v. Hampton*, 675 F.3d 720, 727-28 (7th Cir. 2012).

As the Court will note from review of Hearing Exhibit 1, the taped statement SA Anderson took from Mr. McGibney, at approximately the 4:37 mark of the interview, the following exchange occurred:

| SA Anderson: | "Do you have any questions about those [rights]?" |
| Mr. McGibney: | "When can I get a lawyer?" |
| SA Anderson: | "What's that?" |
| Mr. McGibney: | "When can I get a lawyer?" |
| SA Anderson: | "Whenever you want one. You want to answer any questions I have?" |
| Mr. McGibney: | "Depends on the questions." |

SA Anderson's interview of Mr. McGibney took place in the LaGrange County Jail on July 20, 2020, commencing at 3:38 p.m. In applying the "ordinary people" standard, it is important to note: that SA Anderson never asked Mr. McGibney when he last had something to eat prior to the interview (H.T. 114:4-6); he never asked when Mr. McGibney last had something to drink (H.T. 114:7-9); he failed to ask Mr. McGibney whether he had consumed any drugs or alcohol prior to the interview (H.T. 114:10-13); and he never asked Mr. McGibney how long it had been since he last slept (H.T. 114:16-17). With regard to going through Mr. McGibney's *Miranda* rights, SA Anderson utilized a pre-printed card. (H.T. 99:4-10). He did not use a form that would allow Mr. McGibney to sign indicating he affirmatively was waiving his rights and agreeing to answer questions in the custodial setting of the LaGrange County Jail. (H.T. 115:7-11). This is especially important given the fact that Mr. McGibney never told SA Anderson "I want to waive my *Miranda* Rights and go ahead and talk to you." (H.T. 115:19-22). Mr. McGibney did, however, unequivocally state, "When can I get a lawyer?" (Custodial Interview at 4:37). He did not say,

"I'm not sure if I want an attorney." (H.T. 116:4-5). Nor did he say, "I need to think about whether I want an attorney." (H.T. 116:6-8).

There are several cases instructive under the context of this matter. In *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005), Mr. Lee was read his *Miranda* rights during execution of a search warrant. Law enforcement officials then asked if he wished to speak with them. Lee responded: "Can I have a lawyer?" The Seventh Circuit held Lee's request constituted an unambiguous request for an attorney. The Seventh Circuit went a step further in *Lee* regarding whether a suspect invokes his right to counsel when it stated: "We highly encourage police to follow the advice offered by the Supreme Court [in *Davis*] and take the time to clarify such issues at the time of interrogation rather than in after-the-fact arguments before the courts." 413 F.3d at 626. While Mr. McGibney asserts that his statement was a clear invocation of his right to counsel, it is significant that SA Anderson took no steps to clarify any perceived ambiguity regarding his request. Rather, he forged right ahead into questioning Mr. McGibney in the hostile environment of the LaGrange County Jail. He did so knowing Mr. McGibney had been awake into the early morning hours of July 20 given the time of his arrest and booking into the jail; not knowing when he last ate, last had something to drink, or when he last slept.

In *United States v. Wysinger*, 683 F.3d 784, 790-91 (7th Cir. 2012), the court held the following exchange between defendant and DEA agents constituted an unambiguous invocation by defendant of his right to counsel:

Agent:        "Well, tell us what has been going on. Maybe that's the best way to start."

Wysinger:     "I mean, do you think I should have a lawyer? At this point?

Agent:        "That is up to you . . . I read you your rights. If you want an attorney, by all means, get one. Ok?"

Wysinger:       "I mean, but can I call one now? That's what I'm saying."

The Seventh Circuit held that Wysinger's two statements, "in context, was an unequivocal request for counsel that no reasonable officer could interpret otherwise." *Id.* at 795-96.

The statements, "When can I get a lawyer," "Can I have a lawyer," and those statements made by Wysinger are all the unquestioned functional equivalent of suspects unambiguously invoking their right to counsel. In this instance, SA Anderson failed to honor that request by Mr. McGibney. His failure to do so, in context, should result in any statements given by Mr. McGibney being suppressed and excluded from evidence in this matter.

VI.     <u>The Search and Seizure of Data Contained on Mr. McGibney's Cell Phone Was Overbroad and, as such, Data Seized Should be Suppressed</u>

While law enforcement agents have long been permitted to search the person of a defendant incident to a lawful arrest for whatever evidence they may find of his offense, a warrant is required to search a cell phone, "even when a cell phone is seized incident to arrest." *Riley v. California*, 573 U.S. 373 (2014); *accord United States v. Bishop*, 910 F.3d 335 (7th Cir. 2018). In *Riley*, the Supreme Court reasoned that, because of the vast array of data that individuals can and do store on their cell phones, "a cell phone search would typically expose to the government far more than the most exhaustive search of a house. A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form." 573 U.S. at 396-97. "The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions[.]" *Id.* at 394.

If the scope of a search exceeds what the warrant permits, the search is unconstitutional. *Horton v. California*, 496 U.S. 128, 140 (1990). In this instance, the warrant sufficiently described the items to be seized such that law enforcement officers did not have to exercise their discretion

24

in determining what data could be seized from Mr. McGibney's phone. *Hessel v. O'Hearn,* 977 F.2d 299, 306 (7th Cir. 1992) (citing, *e.g.*, *United States v. Shoffner,* 826 F.2d 619, 630-31 (7th Cir. 1987)). The search conducted, however, was not limited to the scope that was authorized. (H.T. 110; 146). In fact, SA Anderson admitted on cross-examination that "there was a whole lot of stuff that wasn't even responsive to the search warrant that was on the phone . . . ." (H.T. 110:3-17). We know SA Kaiser performed a comprehensive bit-for-bit physical extraction of all data on Mr. McGibney's phone. (H.T. 131:2-9; 134:6-25). This confirms significant data was seized from Mr. McGibney's phone that was not responsive to the warrant. No justification for such a "general" search existed in this case.

The Fourth Amendment was adopted largely to "prevent . . . 'general, exploratory rummaging in a person's belongings' and the attendant privacy violations." *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

"[A] warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Kentucky v. King,* 563 U.S. 452, 459 (2011). Suppression is required of evidence that is outside the scope allowed by a warrant. *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988). Where, like here, agents flagrantly disregard the terms of a warrant and effect the "widespread seizure of items that were not within the scope of the warrant," blanket suppression of all evidence obtained by the search is appropriate. *United States v. Liu*, 239 F.3d 138, 140-42 (2d Cir. 2000) (explaining that "[t]he rationale for blanket suppression

is that a search that greatly exceeds the bounds of a warrant and is not conducted in good faith is essentially indistinguishable from a general search.").

In this case, SA Kaiser engaged in a general search of Mr. McGibney's cell phone when he conducted a comprehensive bit-for-bit physical extraction of all data contained on the phone. (H.T. 131:2-9; 134:6-25). Accordingly, all evidence seized from Mr. McGibney's cell phone should be suppressed and excluded from evidence in this matter.

VII.     Application of the Exclusionary Rule

Under the exclusionary rule, evidence obtained in violation of the Fourth and Fifth Amendment may not be introduced at trial in an effort to support a defendant's guilt. *See Elkins v. United States*, 364 U.S. 206, 223 (1960) (Fourth Amendment); *Bram v. United States*, 168 U.S. 532, 548 (1897) (Fifth Amendment). The purpose of the exclusionary rule is to deter police misconduct. *See Utah v. Streiff,* 136 S. Ct. 2056, 2063 (2016); *Arizona v. Evans,* 514 U.S. 1, 10 (1995).

In this matter, Mr. McGibney was subjected to multiple violations of his constitutional rights. First, as set forth above, Trooper Youpel violated his Fourth Amendment rights by improperly stopping his automobile on the evening of July 19, 2020. Second, his Fifth Amendment rights were violated when SA Anderson moved forward with custodial interrogation of him after Mr. McGibney had made an unambiguous request for counsel in the LaGrange County Jail following his arrest. In addition, because the initial arrest was illegal, any statements made to SA Anderson must be excluded from evidence in this matter. *Brown v. Illinois,* 423 U.S. 590, 602 (1975). Finally, a second Fourth Amendment violation occurred when SA Kaiser seized information from Mr. McGibney's phone that exceeded that which he was allowed to seize pursuant to the search warrant obtained by SA Anderson.

Suppression of evidence seized as a result of these violations and all evidence obtained as a result of Trooper Youpel's unconstitutional stop of Mr. McGibney's car is required under the Fruit of the Poisonous Tree Doctrine. This doctrine grew out of the Supreme Court's extension of the exclusionary rule to the indirect as well as the direct products of illegal searches in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920). Explaining this rule, the Supreme Court has said, "The exclusionary rule also prohibits the introduction of derivative evidence, both tangible and intangible, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search . . . ." *Nardone v. United States*, 308 U.S. 338, 341 (1939); *see also Wong Sun v. United States,* 371 U.S. 471 (1963).

Applying the Fruit of the Poisonous Tree Doctrine in this matter should result in the exclusion of all evidence obtained as a direct or indirect result of the illegal stop of Mr. McGibney's vehicle by Trooper Youpel. Exclusion of this evidence leaves the government with no evidence on which to proceed against Mr. McGibney under the indictment currently pending against him. As such, the indictment and charge pending against Mr. McGibney should be dismissed.

VIII.    <u>Conclusion and Prayer for Relief</u>

Based upon the facts and legal analysis set forth above, Mr. McGibney's Motion to Suppress the Stop of his Automobile should be granted by the Court and all evidence obtained by the government as a result of this unconstitutional stop should be suppressed pursuant to the Fruit of the Poisonous Tree Doctrine. Further, upon the granting of this Motion, the government will have no evidence upon which to pursue the pending charge against Mr. McGibney. As such, the charge pending against him should be dismissed.

Further, given the violation of Mr. McGibney's rights under *Miranda v. Arizona*, any statement taken from him by SA Anderson should be suppressed.

Finally, the overbroad search of Mr. McGibney's phone should result in the suppression of all evidence seized in the execution of the search warrant upon it.

Dated: April 26, 2021                     Respectfully submitted,

                                          BARNES & THORNBURG LLP


                                          */s/George E. Horn, Jr.*
                                          George E. Horn, Jr. (11721-71)
                                          Michael S. Bergerson, Jr. (35976-46)
                                          201 S. Main St., Suite 400
                                          South Bend, Indiana 46601
                                          Telephone: (574) 233-1171
                                          ghorn@btlaw.com
                                          mbergerson@btlaw.com

                                          *Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 26th day of April, 2021, service of a true and accurate copy of the foregoing was served on the United States Attorney via the Court's ECF system.

BARNES & THORNBURG LLP


*/s/ George E. Horn, Jr.*