UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No: 1:20-CR-42 |
| | ) | |
| ADAM D. McGIBNEY | ) | |

**GOVERNMENT'S POST-HEARING BRIEF IN RESPONSE TO
DEFENDANT'S FIRST, SECOND AND THIRD MOTIONS TO SUPPRESS
STATEMENTS AND EVIDENCE**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iv

I.   STATEMENT OF THE ISSUES ........................................................................ 2

II.  FACTUAL BACKGROUND ............................................................................... 2

    A.   The Stop ........................................................................................................ 2

    B.   Interview at the LaGrange County Jail ......................................................... 6

    C.   Search of Defendant's Cellular Telephone ..................................................... 9

III. ARGUMENT ..................................................................................................... 11

    A.   The Stop did not Violate the Defendant's Fourth Amendment Rights ........ 11

       1.   The First Lane Change Constituted a Traffic Violation ............................ 12

       2.   The Second Lane Change Constituted a Traffic Violation ........................ 18

       3.   ISP Trooper Youpel was the More Credible Witness ................................. 19

    B.   During His Interview at the LaGrange County Jail, Defendant Waived his
*Miranda* Rights, Voluntarily Agreed to Speak with SA Anderson and did not
Invoke his Right to Counsel .............................................................................. 22

    C.   Search of the Cell Phone ............................................................................... 27

       1.   The Search Procedure did not Violate the Fourth Amendment ................ 27

       2.   Even if the Court Finds that there was a Problem with the Execution of

the Search Warrant, the Good Faith Exception Applies .................................... 33

IV.   CONCLUSION ................................................................................................. 34

# TABLE OF AUTHORITIES

**CASES**

*Andresen v. Maryland,*

    427 U.S. 463 (1976) ................................................................................. 32

*Berghuis v. Thompson,*

    560 U.S. 370 (2010) ................................................................................. 23

*Davis v. United States,*

    512 U.S. 452 (1994) ................................................................................. 24

*Edwards v. Arizona,*

    451 U.S. 477 (1981) ................................................................................. 24

*Groh v. Ramirez,*

    540 U.S. 551 (2004) ................................................................................. 27

*Guerra v. United States,*

    No. EP-18-CV-00270-FM, 2019 WL 7761442 (W.D. Tex. Nov. 15, 2019) ............. 19

*Heien v. North Carolina,*

    574 U.S. 54 (2014) ................................................................................. 11

*Herring v. United States,*

    555 U.S. 135 (2009) ................................................................................. 33

*Hudson v. Michigan,*

    547 U.S. 586 (2006) ................................................................................. 33

*Love v. State,*

  741 N.E.2d 789 (Ind. 2001) ................................................................ 14

*Miranda v. Arizona,*

  384 U.S. 436 (1966) ................................................................... 22, 23

*Moran v. Burbine,*

  475 U.S. 412 (1986) ......................................................................... 23

*Peck v. State,*

  712 N.E.2d 951 (Ind. 1999) ................................................................ 14

*State v. Geis,*

  779 N.E.2d 1194 (Ind. Ct. App. 2002).................................................... 14

*Steen v. Myers,*

  486 F.3d 1017 (7th Cir. 2007) .............................................................. 4

*United States v. Alston,*

  No. 15CR 435 (CM), 2016 WL 2609521 (S.D.N.Y. Apr. 29, 2016)........................ 28

*United States v. Bishop,*

  910 F.3d 335 (7th Cir. 2018) ........................................................... 28, 31

*United States v. Brown,*

  832 F.2d 991 (7th Cir. 1987) ............................................................. 28

*United States v. Cashman,*

  216 F.3d 582 (7th Cir. 2000) ............................................................. 11

*United States v. Christine,*

  687 F.2d 749 (3rd Cir. 1982) ............................................................. 31

*United States v. French,*

   291 F.3d 945 (7th Cir. 2002) ................................................................ 20

*United States v. Fumo,*

   No. 06-319, 2007 WL 3232112 (E.D. Pa. 2007) ..................................... 32

*United States v. Ganias,*

   824 F.3d 199 (2nd Cir. 2016) ................................................................. 28

*United States v. Hill,*

   459 F.3d 966, 978 n. 14 (9th Cir. 2006) ................................................ 32

*United States v. Jackson,*

   300 F.3d 740 (7th Cir. 2002) ................................................................. 23

*United States v. Lee,*

   413 F.3d 622 (7th Cir. 2005) ................................................................. 24

*United States v. Leon,*

   468 U.S. 897 (1984) ............................................................................... 33

*United States v. LeShore,*

   543 F.3d 935 (7th Cir. 2008) ................................................................. 23

*United States v. Lewis,*

   920 F.3d 483 (7th Cir. 2019) ................................................................. 11

*United States v. Mejorado,*

   2015 WL 106378 (S.D. Cal. Jan. 7, 2015) ............................................. 26

*United States v. Muriel,*

   418 F.3d 720 (7th Cir. 2005) ................................................................. 11

*United States v. Shabaz,*

    579 F.3d 815 (7th Cir. 2009) ......................................................................... 23, 24

*United States v. Simon,*

    937 F.3d 820 (7th Cir. 2019) ......................................................................... 11, 19

*United States v. Smith,*

    218 F.3d 777 (7th Cir. 2000) ......................................................................... 23, 24

*United States v. Thurman,*

    889 F.3d 356 (7th Cir. 2018) ............................................................................... 23

*United States v. Vallar,*

    635 F.3d 271 (7th Cir. 2011) ............................................................................... 23

*United States v. Wantuch,*

    525 F.3d 505 (7th Cir. 2008) ............................................................................... 19

*United States v. Williams,*

    592 F.3d 511 (4th Cir. 2010) ............................................................................... 32

*Whren v. United States,*

    517 U.S. 806 (1996) ...................................................................................... 11, 12

**STATUTES**

26 U.S.C. § 5845 ..................................................................................................... 7

26 U.S.C. §§ 5841 .................................................................................................. 5

Ind. Code § 35-47-2-18 .......................................................................................... 5

Ind. Code § 35-47-5-13 .......................................................................................... 5

Ind. Code § 9-21-8-24 .......................................................................................... 13

Ind. Code § 9-21-8-25 ................................................................................ 13, 14

Ind. Code § 35-47-2-1 .................................................................................. 4, 5

**RULES**

Fed. R. Evid. 701 ............................................................................................ 18

Fed. R. Evid. 803(5) ...................................................................................... 16

Fed. R. Crim. Pro. 41(e)(2)(B) .......................................................... 28, 29, 30

Fed R. Crim. Pro. 41 (e)(2)(A) ............................................................... 29

Fed. R. Crim. Pro. 41(f)(1)(A) ..................................................................... 29

Fed R. Crim. Pro. 41................................................................29, 30, 32, 33

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No: 1:20-CR-42 |
| | ) | |
| ADAM D. McGIBNEY | ) | |

## GOVERNMENT'S POST-HEARING BRIEF IN RESPONSE TO DEFENDANT'S FIRST, SECOND AND THIRD MOTIONS TO SUPPRESS STATEMENTS AND EVIDENCE

Comes now the United States of America by Sarah E. Nokes, Assistant United States Attorney for the Northern District of Indiana, and files the government's post-hearing Brief in Response to Defendant's First and Second Motions to Suppress filed October 16, 2020 as ECFs 28 and 29 and Defendant's Third Motion to Suppress, filed October 27, 2020 as ECF 32. In his first motion, the defendant, Adam D. McGibney ("McGibney"), by counsel, moves the Court to suppress evidence found in McGibney's vehicle, alleging that McGibney was subject to an illegal stop and seizure which violated the Fourth Amendment. In his second motion, McGibney argues that incriminating statements he made should be suppressed as violative of his rights under *Miranda v. Arizona* and the Fifth Amendment. In his third motion, McGibney argues that the search of McGibney's phone pursuant to a search warrant issued by this Court was overbroad in violation of the Fourth Amendment. The government contends that none of McGibney's rights were violated and that there is no basis for suppression.

1

## I.   STATEMENT OF THE ISSUES

A. Did the traffic stop of the defendant's vehicle on July 20, 2020, violate the defendant's Fourth Amendment Right against unreasonable seizure?

B. Did the custodial interrogation of the defendant by Special Agent Anderson violate the defendant's rights under *Miranda v. Arizona* and the Fifth Amendment?

C. Did the search of the defendant's cellular telephone, pursuant to a search warrant issued by this Court, violate the defendant's Fourth Amendment right against unreasonable searches?

## II.   FACTUAL BACKGROUND

The relevant facts were established through the presentation of evidence in the form of witness testimony and exhibits, at a hearing held on February 12, 2021.[1]

### A. The Stop

Indiana State Police ("ISP") Trooper George Youpel ("Trpr. Youpel") testified about the circumstances of the traffic stop he conducted upon the vehicle driven by the defendant on the night/early morning of July 19-20, 2020. At the time of the traffic stop, Trpr. Youpel had approximately two and a half years' experience as a law enforcement officer with the Steuben County Sheriff's Office and ISP. (Tr. at 7-8). Trpr. Youpel had completed a three-month basic law enforcement training academy, had graduated from a six-month long ISP academy and had completed a three-month phase of field training during which he received on-the-job training by a more

---

[1] The government will cite the transcript of the evidentiary hearing (ECF 81) as "Tr. at [page number]."

experienced officer. (Tr. at 9-10, 38). At the time of the traffic stop, Trpr. Youpel was assigned to work night shifts (10:00 p.m. – 6:30 a.m.) patrolling the Indiana Toll Road (I-80/90) in Steuben and LaGrange Counties in the Northern District of Indiana. (Tr. at 8, 11). At the time of the traffic stop, Trpr. Youpel patrolled without a partner in a police squad car which is not equipped with a dash camera. (Tr. at 12).

At approximately midnight on July 20, 2020, Trpr. Youpel observed a Lincoln passenger car make two lane changes without signaling properly. (Tr. at 15-16). At the time he observed the violations, both the Lincoln and Trpr. Youpel were traveling eastbound on I-80/90, the Indiana Toll Road. (Tr. at 15). Trpr. Youpel observed the Lincoln travel from the right-hand to the left-hand lane of traffic in order to pass a slower-moving semi-truck which was traveling in the right-hand lane. (Tr. at 14). Trpr. Youpel testified that he could clearly see the Lincoln as it made the change from the right-hand to the left-hand lane, as there were no obstructions or other vehicles between them at the time. (Tr. at 15, 80). Trpr. Youpel observed that the driver of the Lincoln did not activate his turn signal to indicate the lane change until at least part of the Lincoln had already crossed over the lane divider line between the right-hand and left-hand lanes. (Tr. at 14-15, 78). After the Lincoln passed the semi-truck, Trpr. Youpel observed the driver signal the intent to change lanes from the left-hand lane back to the right-hand lane. (Tr. at 15). Trpr. Youpel testified that the driver of the Lincoln did not signal his intent to change lanes continuously for 300 feet prior to the left-hand to right-hand lane change. (Tr. at 16, 77-78). About two miles further down the road (approximately two minutes later), Trpr. Youpel initiated a traffic stop upon

the vehicle, which pulled over promptly. (Tr. at 16, 40).

When the Lincoln pulled over, Trpr. Youpel discerned that McGibney was the driver and sole occupant of the vehicle. (Tr. at 16-17). As McGibney leaned over to retrieve the vehicle registration from the glove compartment, Trpr. Youpel observed a bulge on McGibney's right hip which he believed might be a firearm. (Tr. at 18). Trpr. Youpel asked McGibney if there were any weapons inside the vehicle, and McGibney stated that there were and that he had a firearm on his hip.[2] (Tr. at 19). Trpr. Youpel asked McGibney if he had a permit to carry a handgun and McGibney replied that he did not need or possess a permit. (Tr. 19-20). Trpr. Youpel also asked McGibney if there were other firearms in the vehicle, and McGibney stated that there was a shotgun and rifle in the trunk. (Tr. at 20). Trpr. Youpel asked McGibney if he could retrieve the firearm from McGibney's hip. (Tr. at 21). McGibney consented and Trpr. Youpel removed a loaded, .45 caliber handgun from McGibney's person. *Id*. Trpr. Youpel secured McGibney's handgun and then asked him to step out of the vehicle and placed him in handcuffs.[3] (Tr. at 21-22). After handcuffing McGibney, Trpr. Youpel advised him of his *Miranda* rights, which McGibney indicated he understood. (Tr. at 24-25). Trpr. Youpel described McGibney's demeanor as "very calm" and stated that he seemed to lack emotion and did not seem nervous. (Tr. at

[2] In his Second Motion to Suppress (ECF 29), McGibney challenged the admissibility of statements made at the scene of the traffic stop, alleging that they were taken in violation of *Miranda* and the Fifth Amendment. However, the defendant's brief does not address any *Miranda* arguments related to questioning at the scene of the traffic stop. As arguments not briefed are considered abandoned, the government will not address these arguments further in this brief. *See Steen v. Myers*, 486 F.3d 1017, 1020-21 (7th Cir. 2007) (absence of discussion in briefs amounts to abandonment of claim).
[3] Carrying a handgun on or about a person's body or in a vehicle without a license to carry such a firearm is a misdemeanor offense unless certain exceptions apply. Ind. Code § 35-47-2-1 (West); *see* Tr. at 20.

25). Trpr. Youpel asked McGibney if he could search the vehicle, and McGibney said yes. *Id*. Trpr. Youpel searched the vehicle and found *inter alia*, a container with handgun and shotgun ammunition, seven, 30-round AR-15 magazines loaded with armor piercing rounds, four unloaded AR-15 magazines, a tactical vest with armored plates, two loaded .45 caliber handgun magazines, an unloaded shotgun and an unloaded AR-15 style rifle with no serial number. (Tr. at 27-31). McGibney stated that all of the firearms in the vehicle were his. (Tr. at 31). The barrel of the AR-15 style rifle was later found to measure approximately 11⅜ inches long, classifying it as a short-barreled rifle, a weapon which must be registered in the National Firearms Registration and Transfer Record ("NFRTR") pursuant to 26 U.S.C. §§ 5841 and 5845. (Tr. at 95). Trpr. Youpel consulted with the legal division of the Indiana State Police for assistance in determining the appropriate charges to levy against McGibney. (Tr. at 73-76). McGibney was thereafter arrested for three violations of Indiana law: carrying a handgun without a permit in violation of Ind. Code § 35-47-2-1, possession of a gun with altered identifying marks in violation of Ind. Code § 35-47-2-18 and possession of body armor during the commission of a felony in violation of Ind. Code § 35-47-5-13. (Tr. 32-33). The vehicle was later towed from the scene of the traffic stop pursuant to Indiana State Police Standard Operating Procedure ENF-008. (Tr. at 33; Govt. Exh. 3).

Defendant McGibney also testified limitedly about the circumstances of the traffic stop. McGibney testified that Trpr. Youpel pulled out of the interstate median and followed him as he drove amongst a group of other cars with whom he was loosely

traveling for ten minutes prior to the traffic stop. (Tr. at 162-163). McGibney testified that when he moved from the right-hand to left-hand lane to pass a slower-moving semi-truck in view of Trpr. Youpel, he used his turn signal for a "gratuitous amount of time" of at least six seconds. (Tr. at 164). McGibney testified that he used his turn signal for the same amount of time when signaling his intention to move from the left-hand lane back to the right-hand lane. (Tr. at 165). Upon cross-examination, McGibney gave vague details about his cross-country drive. McGibney testified that he had started driving at sunrise (but could not give a specific time for when that actually was) from a rest stop on the border of Minnesota and South Dakota (he did not give a town name or distinguish which state this stop was in), believed he had been traveling at the time on I-80,[4] or perhaps I-90, and could not or would not give any details about where he had made stops during the trip. (Tr. 166-168). McGibney acknowledged that during his lengthy trip he had passed other vehicles, but he could not recall specifics about those passing incidents. (Tr. at 170). McGibney acknowledged that he did not know Trpr. Youpel and that there would be no reason for personal animus between them but posited that Trpr. Youpel might have pulled him over "to embellish his report," a report which, at the time of the traffic stop had not yet been written. (Tr. at 171).

## B. Interview at the LaGrange County Jail

Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Task Force

---

[4] The defendant could not have been traveling on I-80 at the time of his alleged rest stop on the South Dakota/Minnesota border as he initially testified (Tr. at 166), as that interstate does not travel through either of those two states. *See* maps.google.com.

Officer ("TFO") Caleb Anderson testified that he was called about the items found in the traffic stop early in the morning on July 20, 2020. (Tr. at 90-91).[5] Upon learning of the offenses with which McGibney had been charged, SA Anderson examined the short-barreled rifle which was the subject of the charges. (Tr. at 91). After viewing photos of the gun, SA Anderson suspected that the short-barreled rifle had been constructed, in homemade fashion, from an "80% lower" receiver. (Tr. at 91-92). SA Anderson explained that such a homemade gun need not have a serial number as long as it was manufactured by the person who possessed the gun and thus had not been transferred to any other person. *Id*. SA Anderson therefore believed that the obliterated serial number offense had been charged in error[6] (and thus also that the possession of body armor during the commission of a felony offense had also been charged in error) and immediately set out to make his opinion known to both Trpr. Youpel and the LaGrange County prosecutor so that the charges could be dealt with accordingly. *Id*. SA Anderson physically examined and measured the barrel of the rifle and determined that it was approximately 11⅜ inches long, making the gun a short-barreled rifle pursuant to 26 U.S.C. § 5845. (Tr. at 95).

---

[5] By July 2020, Anderson had worked as a task force officer with the ATF for four years and as a trooper/detective with the ISP for approximately 13 years. In August 2020, Anderson was hired by the ATF as a Special Agent ("SA"), which was his title at the time of his testimony at the suppression hearing in February 2021. The government will thus refer to him as "SA Anderson."

[6] While the gun was manufactured from an 80% lower receiver and thus would not have been required to have a serial number if McGibney had done the gunsmithing himself (drilling out the holes necessary to turn the block of metal into a functioning gun receiver) McGibney later admitted that he had purchased the lower receiver already built from someone who had already done the work to turn the piece into a functioning lower receiver. (Govt. Exh. 1 at 14:00 – 14:15). Because the lower receiver was transferred after it was built, it *was* required by law to have a serial number. *See* Tr. at 92-94. Thus, it is certainly arguable that the felony state charge for possession of a firearm without a serial number was a legitimate charge despite SA Anderson's initial opinion of the offense.

SA Anderson thereafter responded to the LaGrange County Jail to conduct a custodial interview of McGibney, which occurred at approximately 3:38 p.m. on July 20, 2020. (Tr. at 96; Govt. Exh. 1 at 00:05[7]). After an exchange of introductory information and an explanation of why SA Anderson was at the jail to speak to McGibney, SA Anderson read McGibney his *Miranda* warnings from a pre-printed card. (Tr. at 99, Govt. Exh. 1 at 4:22). McGibney was informed that he had the right to remain silent, the right to consult with a lawyer before questioning, the right to have a lawyer present with him during questioning and the right to have a lawyer appointed to him, if he could not afford to hire a lawyer, prior to any questioning. (Govt. Exh. 1 at 4:22-4:36). This exchanged followed:

| | |
|---|---|
| [4:37] SA Anderson: | Do you understand those rights? Do you have any questions about those? |
| [4:43] McGibney: | When can I get a lawyer? |
| [4:46] SA Anderson: | Whenever you want one. Do you wanna answer any questions I have? |
| [4:51] McGibney: | Depends on the questions. |
| [4:53] SA Anderson: | Ok yeah, so if there is something you don't want to answer then just tell me 'I don't wanna answer that' and we can bypass it. You're not required to answer it, ok, so if there is something you don't wanna answer, you need to stop me, say 'move past that' and we'll go to the next one. Fair enough? |
| [5:06] McGibney: | Yes, sir |
| [5:07] SA Anderson: | Any other questions? |
| [5:08] McGibney: | No |

---

[7] All references to specific statements made during the recording admitted as Govt. Exh. 1 are approximate and refer to the [minutes:seconds] into the recording that the statements were made.

McGibney admitted that he did not have a carry permit for the handgun found on his person during the traffic stop as required by law. (Govt. Exh. 1 at 5:24-6:00). SA Anderson and McGibney then discussed the short-barrel rifle. McGibney admitted that he had obtained the 80% lower receiver from a friend and that it was already milled out when he received it. (Govt. Exh. 1 at 7:14-7:58; 14:00-14:15). McGibney admitted that he obtained the upper receiver and barrel of the gun from another individual as a set and that he was told that the barrel was 11 inches long. (Govt. Exh. 1 at 9:19-9:50; 11:00-11:15). McGibney also admitted that the firearm was not registered with the ATF/NFRTR. (Govt. Exh. 1 at 9:59-10:59). Multiple times during the interview, SA Anderson asked questions which McGibney, exercising his rights, chose not to answer. (e.g. Govt. Exh. 1 at 11:50, 18:15). SA Anderson asked McGibney if he would consent to allow law enforcement to download his cell phone. (Govt. Exh. 1 at 20:46). Again, exercising his constitutional rights, McGibney declined consent to search his cell phone. (Govt. Exh. 1 at 21:03).

At the outset of the interview, only SA Anderson and McGibney were present, though ATF TFO Phil Ealing joined the interview at approximately 18:58 in the recording. Throughout the interview, agents maintained a calm and cordial tone and McGibney reciprocated in kind. (Govt. Exh. 1). McGibney's demeanor was calm and he did not appear to be nervous, tired, under the influence of drugs or alcohol or unable to understand the questions asked of him. (Tr. at 102-103, 119; Govt. Exh. 1). The interview lasted approximately 40 minutes. (Govt. Exh. 1).

## C. Search of Defendant's Cellular Telephone

On July 23, 2020, the government sought and obtained a search warrant for the defendant's cellular telephone. (Govt. Exh. 2). The search warrant authorized the government to seize records and information from the defendant's phone related to user attribution and McGibney's possession and acquisition of firearms. (Govt. Exh. 2, Attachment B). ATF SA Kaiser testified about the resulting search of the cell phone. SA Kaiser testified that he is a digital media collection specialist, a role for which he was specially trained by the ATF and in which he has multiple years of experience. (Tr. at 122-125). The Court qualified SA Kaiser as an expert in digital media collection. (Tr. at 126). SA Kaiser testified at length about the methods used to collect evidence from digital media including cell phones, tablets and other devices. In this case, SA Kaiser testified that he used Cellebrite software to accomplish an advanced logical extraction, which created an exact copy of the digital contents of McGibney's iPhone from the Apple iTunes backup of the device. (Tr. at 129-131, 138). This copy was then made into a searchable product with the assistance of the Cellebrite software. (Tr. at 132-133, 139). While investigators *extracted* a digital copy of the contents of the entire device, the only items *seized* as evidence are those which are described by the search warrant (Attachment B). (Tr. 107-108, Govt. Exh. 2).

SA Kaiser explained that extracting a digital copy of a device using this software is necessary because if an agent were to simply scroll through a device attempting to find information relevant to an investigation pursuant to a search warrant, it could result in (1) the unintended writing of new information to the phone, (2) the unintended deletion of items or information from a phone (e.g. through

innocuous-looking programs which issue "kill" commands to the phone and wipe all data) and (3) missing information which the user has "deleted" from the phone (and which has thus been sent to the phone's unallocated space, but which is nonetheless still present on the phone). (Tr. at 135-137). SA Kaiser explained that there is no way to make the forensic software only search for and copy items responsive to an investigation or search warrant – the entirety of the device must be copied and an agent must then search through the digital copy to find the items relevant to the investigation. (Tr. at 134, 137).

## III.   ARGUMENT

### A.  The Stop did not Violate the Defendant's Fourth Amendment Rights

A traffic stop is a Fourth Amendment seizure of the occupants of the stopped vehicle and must therefore be reasonable. *Heien v. North Carolina,* 574 U.S. 54, 60 (2014). A traffic stop is reasonable if the initiating officer has probable cause to believe that the driver of the vehicle has committed a traffic offense. *Whren v. United States*, 517 U.S. 806, 810 (1996); *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005); *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000). "If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient basis to pull him over without violating the Constitution." *United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019), cert. denied, 140 S. Ct. 824 (2020); *see United States v. Lewis*, 920 F.3d 483, 490 (7th Cir. 2019) (To show the constitutionality of a traffic stop, the government need only show that the officer had a reasonable belief that the suspect committed a traffic offense; whether the traffic violation was actually committed is a question for the traffic court to decide.).

Trpr. Youpel reasonably believed that McGibney had committed two traffic offenses at the time he initiated a traffic stop of the vehicle, each violations of Indiana traffic laws requiring drivers to signal a lane change before completing a lane change and requiring them to signal continuously at least 300 feet prior to making the lane change. Trpr. Youpel testified that McGibney utilized the lighted turn signals on his vehicle while passing a truck on the interstate, but also testified that in each of two lane change instances, McGibney did not use his turn signal continuously for at least the last 300 feet prior to the lane change maneuver. (Tr. at 16). Specifically, Trpr. Youpel testified that McGibney did not begin signaling his intention to move from the right-hand to the left-hand lane of traffic (hereinafter "the first lane change") until at least part of his vehicle had already passed over the dotted lane divider line. (Tr. at 15). Trpr. Youpel also testified that McGibney failed to signal for 300 feet prior to the left-hand to right-hand lane change (hereinafter "the second lane change") and that he turned his signal off prior to making that maneuver. (Tr. at 16). Based on his observations of McGibney's lane changes, Trpr. Youpel possessed probable cause to believe that McGibney had twice violated Indiana traffic statutes requiring turn signals prior to lane changes and was thus entitled to stop him to address the traffic infractions. *See Whren*, 517 U.S. at 810.

### 1.  The First Lane Change Constituted a Traffic Violation

Trpr. Youpel testified clearly and consistently that McGibney only began to signal the first lane change after he had already begun the maneuver. (Tr. at 14-15, 78). Trpr. Youpel observed this driving behavior while traveling behind McGibney in

the same direction of travel as McGibney, and his view was not obstructed by anything, including other traffic. (Tr. at 80). As it was approximately midnight and dark outside, McGibney's taillights and turn signal lights would have been clearly illuminated, and the reflective, white lane divider line would have been easy to see. (Tr. at 13). None of these observations were called into question during cross examination of Trpr. Youpel, whose account remained consistent: McGibney began the first lane change before he began signaling the lane change, which conduct was in violation of Ind. Code § 9-21-8-25 *and* Ind. Code § 9-21-8-24.

Much of the cross-examination of Trpr. Youpel focused on the fact that while Trpr. Youpel discussed McGibney's traffic violations in terms of the distance required for use of a turn signal prior to a lane change (per Ind. Code § 9-21-8-25), Trpr. Youpel actually issued McGibney a warning citation for a broader traffic code section which prohibits unsafe lane movements. Ind. Code § 9-21-8-24, the statute under which Trpr. Youpel issued McGibney a warning citation, (hereinafter the "warning statute") instructs that a driver may only change from one traffic lane to another when that movement can be done with reasonable safety, and also requires that the vehicle give a visible or audible signal *before* doing so. Ind. Code § 9-21-8-25, which comes just after that section in the Indiana Code, further clarifies what it means to safely signal an intention to turn and, as relevant here, requires a driver traveling in a 50+ mile per hour speed zone to signal an intention to change lanes "continuously for not less than the last three hundred (300) feet traveled by the vehicle before...changing lanes" (hereinafter the "distance statute"). Trpr. Youpel testified that McGibney did not

signal his intention to change lanes until after he was already halfway through doing so – when at least part of his vehicle had passed over the dotted lane divider line. By signaling *during* the lane change and not *before* the lane change as the warning statute requires, McGibney violated the traffic law for which he was issued a warning citation. By failing to signal at all prior to the lane change maneuver, let alone 300 feet beforehand, McGibney also violated the distance statute. Even where a defendant violates one of these (the warning statute or the distance statute) and not both, Indiana courts have clearly held that there is sufficient cause to stop the vehicle. *Peck v. State*, 712 N.E.2d 951, 951 (Ind. 1999) (Stop of defendant justified when "[d]efendant did not signal before turning and so violated Ind. Code § 9-21-8-25."); *Love v. State*, 741 N.E.2d 789, 791 (Ind. 2001) (defendant's argument challenging the legality of a traffic stop based on the warning statute rejected as "unavailing, given that the driver violated [the distance statute] by failing to activate his right turn signal before making a right turn."); *State v. Geis*, 779 N.E.2d 1194, 1196 (Ind. Ct. App. 2002).

When confronted by defense counsel upon cross-examination with all four statutes at issue (the warning statute, the two statutes referenced within the warning statute and the distance statute) and asked to make a legal conclusion about whether McGibney violated the warning statute, Trpr. Youpel, apparently confused, said that he had not. (Tr. at 47). But given the facts that Trpr. Youpel testified to, namely that he did not begin signaling the first lane change until after it had already begun, Trpr. Youpel's on-the-spot legal conclusion was incorrect. Given Trpr. Youpel's testimony,

McGibney most certainly *did* violate the warning statute. It was clear during the hearing that Trpr. Youpel displayed confusion as to the interplay between these four Indiana statutes, and absolutely did not display "shocking and egregious…indifference to the factual and legal errors underlying" McGibney's arrest as the defendant alleges. (ECF 80 at 25). There simply was no factual or legal error underlying Trpr. Youpel's decision to stop McGibney's vehicle.

There were a few questions asked of Trpr. Youpel during cross-examination which he could not answer or which he could not answer without refreshing his recollection through use of the report he wrote about the events of July 20 on that date. (Tr. at 28). There appear to be three specific complaints from the defendant of information that Trpr. Youpel could not recall: (1) where Trpr. Youpel was when he first observed McGibney's vehicle; (2) how long Trpr. Youpel followed McGibney and other vehicles in the area of McGibney's vehicle before the traffic stop; and (3) which lane Trpr. Youpel was in when he observed McGibney's traffic violations. (ECF 80 at 12, 15-17). The government will address each of these complaints in turn.

With respect to the first complaint, when allowed to view his report to refresh his recollection, Trpr. Youpel testified that he was traveling eastbound (the same direction as McGibney) on the interstate when he first observed McGibney's vehicle. The defendant's reference to this refreshed recollection as "contradicting" Trpr. Youpel's previous testimony that he did not recall where he was when he first observed McGibney's vehicle is misleading and wrong. (ECF 80 at 22-23). Trpr. Youpel testified that he could not recall where he was when he first saw McGibney's

vehicle during a hearing some six and a half months after the events of July 20, 2020. Then, when allowed to refresh his recollection with the report he wrote within twelve hours of the events of that night, he was able to shed light on the fact that he first saw McGibney as both vehicles were traveling eastbound on the interstate. This is not a contradiction. It is the very reason why the courts and the Federal Rules of Evidence allow witnesses to use accurate documents created at or near the time of an event to refresh a witness's recollection. *See* Fed. R. Evid. 803(5).

Defendant's second complaint is that Trpr. Youpel could not recall the length of time during which he traveled behind McGibney and other vehicles before making the traffic stop. (ECF 80 at 12). But the fact that Trpr. Youpel could not say how long he followed McGibney prior to making the traffic stop actually lends credibility to his testimony. Trpr. Youpel had no personal animus toward McGibney and no reason to zero in on him as a target to follow as the vehicles proceeded down the interstate. Trpr. Youpel did not target McGibney and thus begin to track how far and for how long he followed McGibney, because McGibney's vehicle was just another car on the interstate until he committed traffic violations in front of Trpr. Youpel. Trpr. Youpel observed the violations he testified about, and only then began tracking how long he followed McGibney until the actual traffic stop occurred. (*See* Tr. at 39-40). If Trpr. Youpel had testified that he followed McGibney for a specific and lengthy period of time before observing any traffic violation, the Court might then rightly wonder why McGibney was specifically targeted to be followed prior to doing anything wrong. The fact that Trpr. Youpel did not target McGibney and could not tell the Court exactly

16

how long he had spent following behind McGibney and others as they traveled down the interstate tends to show that McGibney was not targeted (for his out-of-state license plate or for any other reason) and only came to the specific attention of the trooper once he committed traffic violations.

Third, Defendant complains that Trpr. Youpel could not remember "any other pertinent details" to the traffic stop because he could not recall which lane of the interstate he (the trooper) was in at the time he observed McGibney's first lane change. (ECF 80 at 16-17). But why would this detail be particularly important? Defendant does not say, and the government posits it is because that detail is not important. Whether Trpr. Youpel was in the left or right-hand lane behind McGibney, the uncontroverted testimony was that he was within a distance which would allow him to see McGibney's driving behavior. Trpr. Youpel absolutely remembered the pertinent details leading up to his traffic stop, including that Trpr. Youpel was behind McGibney, that he was able to see McGibney's vehicle as it moved between lanes, that he observed the turn signal on McGibney's vehicle and that was able to view all of the driving behavior he testified about unobstructed, as there were no other vehicles between the trooper and McGibney. In his testimony, McGibney alleged that during the first lane change maneuver, Trpr. Youpel's vehicle was in the left-hand lane "a few car lengths" behind McGibney. (Tr. at 163). McGibney did not allege that Trpr. Youpel's view of his vehicle was obstructed by any other traffic, and instead intimated that he drove extra carefully, because his driving behavior was in full view of the trooper. (Tr. at 164). The trooper did not note in his report which lane he was

in when he observed McGibney's driving conduct, and it simply does not matter, as it was clear that whichever lane (right or left) he was in, he had the ability to view McGibney's vehicle and the traffic violations he committed.

Defendant's arguments about whether Trpr. Youpel could accurately gauge the distance traveled with the turn signal on (ECF 80 at 17-18) are inapposite as to the first lane change, because it does not matter the distance, nor for how many seconds, McGibney utilized his turn signal to make the right-hand to left-hand lane change since Trpr. Youpel's testimony was that he did not signal *at all* prior to beginning the lane change maneuver, which is what the law clearly requires. Once McGibney's vehicle crossed the lane divider line without signaling, he had committed two traffic infractions (as each of the warning statute and the distance statute requires use of a turn signal *before* a lane change) and it would not matter then whether he belatedly signaled the lane change for 3 seconds, 6 seconds or 10 seconds; the violation could not then be cured.

## 2.  The Second Lane Change Constituted a Traffic Violation

Trpr. Youpel testified that McGibney again failed to signal for 300 feet prior to making the second lane change, from the left-hand to the right-hand lane, after passing a semi-truck. Trpr. Youpel's distance testimony was an estimate based upon his observations and experience and was not based upon scientific calculation. A lay witness may testify to opinions or inferences if they are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed. R. Evid. 701. Trpr. Youpel

could clearly see McGibney's vehicle and thus his opinion was based upon his "first-hand knowledge or observation" as the Rule requires. *United States v. Wantuch*, 525 F.3d 505, 513 (7th Cir. 2008). Other courts have held that estimates of distances are within the purview of lay witness testimony. *See, e.g.*, *Guerra v. United States*, No. EP-18-CV-00270-FM, 2019 WL 7761442 at *2 (W.D. Tex. Nov. 15, 2019) ("Measuring distance is an experience familiar to everyday life and is not limited to specialists."). Trpr. Youpel testified that McGibney's use of the turn signal during the second lane change was "very quick. That was more of if he just went to click it. It was very quick. It went on and then off." (Tr. at 53). Trpr. Youpel further explained that, though he kept his focus on McGibney's vehicle, he uses the lane divider lines and other landmarks to estimate the distances to which he testified. (Tr. at 55-56). There is no reason to believe that Trpr. Youpel, a law enforcement officer who regularly patrols the interstate, was not capable of reliably estimating a distance of 300 feet, the familiar length of a football field. Even if Trpr. Youpel was somehow mistaken in believing that the distance was less than 300 feet, so long as he reasonably believed he saw McGibney commit the traffic violation, that was a sufficient basis for the traffic stop. *Simon*, 937 F.3d at 829.

### 3. ISP Trooper Youpel was the More Credible Witness

The Court is faced with the task of determining whether to credit the testimony of Trpr. Youpel or that of the defendant on the question of turn signal use because each testified in direct contravention of the other. In making this determination, the Court may look at the totality of the circumstances, including their verbal and

nonverbal responses, attitude, tone as well as any bias or motivation to lie. *See United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002).

Trpr. Youpel is a well-trained, if relatively new, officer, who regularly patrols during the night shift on the Indiana Toll Road. It was clear from his testimony that this traffic stop was routine, at least at its inception. Trpr. Youpel testified consistently that he observed McGibney begin to make (the first) lane change without signaling until his vehicle was already between the lanes and that he observed McGibney make another lane change without signaling the required 300 feet prior to the change. Trpr. Youpel testified that there was no obstruction in his line of sight, a fact which was corroborated by McGibney's testimony. When Trpr. Youpel was questioned about a fact which he could not recall (e.g. which lane he was in when he observed McGibney's traffic violations), he did not lie or attempt to craft a narrative beneficial to the government; rather he truthfully testified that he could not recall that particular fact. As to the important facts underlying the traffic stop, Trpr. Youpel remembered them and/or was able to recollect them after being allowed to refresh his recollection by references to the report within hours of the traffic stop.

At the time of the stop, approximately midnight, on July 20, 2020 Trpr. Youpel was relatively fresh as he had been on shift for only approximately two hours. By contrast, McGibney testified that he had started driving that day approximately 18 hours prior to the stop (at sunrise on July 19, 2020) and was thus likely at least somewhat fatigued. McGibney testified that he had started his day of driving at a rest stop on the border of South Dakota and Minnesota, some 650-700 miles from the

location of the traffic stop.[8] Given McGibney's entire day of driving as opposed to Trpr. Youpel's mere two hours on shift at the time of the stop, Trpr. Youpel was in a better position to accurately observe and recall details bearing on the traffic stop. Additionally, Trpr. Youpel had no bias or personal animus against McGibney (Tr. at 171), and he had no motive to lie or fabricate reasons for a traffic stop. By contrast, McGibney has every motivation to deny commission of any traffic violations, as the fate of the federal case against him hangs in the balance.

Under questioning, McGibney could not recall practically *any* of the basic details of his cross-country drive except, conveniently, the exact number of seconds during which he allegedly used his turn signal during two lane changes on a day during which he had done at least 10 hours of driving. McGibney could not accurately recall the town he had stayed in the night previously, the places he had stopped along his trip or the details of any other lane changes he made during the journey. (Tr. at 165-168). McGibney attempted to explain this moment of clarity regarding the lane changes in the morass of his forgetfulness about the details of the day by claiming that he remembered his driving conduct because it had been attendant to the stressful event of getting pulled over and charged with crimes. (Tr. at 168-169). But this allegation is belied by the fact that Trpr. Youpel described McGibney's demeanor, once stopped, as "very calm," "monotoned" and lacking in nervousness or emotion. (Tr. at 25). Either the event was so stressful that it occasioned crystal clear memories of the approximately ten minutes that had come before or it was not stressful enough

---

[8] *See* maps.google.com.

to cause any excited behavior. McGibney is certainly capable of displaying emotion even in stressful situations, as his tone under cross-examination was snide and incredulous, not calm or monotone. McGibney simply did not display the distress (either at the scene of the traffic stop or later, during his interview with SA Anderson) which he wants the Court to believe was the trigger for his crystal-clear memory of turn signal timing. Finally, though SA Anderson and McGibney discussed the events of the traffic stop during the custodial interview later on the day of the stop, McGibney never complained to SA Anderson that he believed he had been pulled over erroneously. If the bases of the traffic stop were as egregiously false as McGibney now claims them to have been, it would have been natural for him to at least mention that to SA Anderson during the cordial discussion they had about the events of the stop, but he did not. (Govt. Exh. 1).

Trpr. Youpel testified clearly and consistently that McGibney committed multiple traffic violations by failing to utilize his turn signal before the first lane change and by failing to utilize his turn signal at least 300 feet prior to the second lane change. Because the traffic stop was supported by probable cause that McGibney had committed multiple traffic violations (though only one violation was necessary for a constitutional stop), the resulting seizure did not violate McGibney's Fourth Amendment rights and no evidence should be suppressed as a result of the stop.

## B. During His Interview at the LaGrange County Jail, Defendant Waived his *Miranda* Rights, Voluntarily Agreed to Speak with SA Anderson and did not Invoke his Right to Counsel

Pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), a suspect subject to custodial interrogation must be notified of his constitutional rights to counsel and

against self-incrimination. A suspect's waiver of *Miranda* rights must be made knowingly, intelligently and voluntarily. *Id*.; *United States v. LeShore*, 543 F.3d 935, 941 (7th Cir. 2008). Courts look to the totality of circumstances surrounding the interrogation to determine whether (1) the relinquishment of *Miranda* rights was the product of free and deliberate choice rather than intimidation, coercion or deception; and (2) the waiver was made with full awareness of nature and consequences of the decision. *United States v. Vallar*, 635 F.3d 271, 284 (7th Cir. 2011)(citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). In analyzing the totality of the circumstances, courts consider the "defendant's background and conduct, the duration and conditions of the interview and detention, the physical and mental condition of the defendant, the attitude of the law enforcement officials, and whether law enforcement officers used coercive techniques, either psychological or physical." *United States v. Shabaz*, 579 F.3d 815, 820 (7th Cir. 2009); *United States v. Jackson*, 300 F.3d 740, 748 (7th Cir. 2002).

A suspect's waiver of *Miranda* rights may be express or implied. *Berghuis v. Thompson*, 560 U.S. 370, 384 (2010). Waiver "may be inferred from a defendant's understanding of [his] rights coupled with a course of conduct reflecting [his] desire to give up these right[s]." *United States v. Smith* 218 F.3d 777, 781 (7th Cir. 2000). A defendant need not sign a *Miranda* waiver form for waiver to be valid, and waiver may be inferred from a defendant's conduct in voluntarily electing to answer questions posed by law enforcement. *See United States v. Thurman*, 889 F.3d 356, 365 (7th Cir. 2018) (defendant's refusal to sign advice-of-rights form did not defeat

credible evidence of implied waiver); *accord Smith* 218 F.3d at 781. A suspect bears the burden of making a "clear and unambiguous assertion" of his rights, including his right to counsel. *Shabaz*, 579 F.3d at 818 (quoting *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005)). If the suspect requests counsel at any time during the interview, he may not be subjected to further questioning until an attorney has been made available to him. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," officers need not end the interview. *Davis v. United States*, 512 U.S. 452, 459 (1994). In order to invoke his right, "the suspect must unambiguously request counsel." *Id.*

In this case, SA Anderson properly informed McGibney of his *Miranda* rights prior to questioning him. (Govt. Exh. 1 at 4:22). SA Anderson ensured that McGibney understood his *Miranda* rights ("Do you understand those rights? Do you have any questions about those?) and answered McGibney's only question ("When can I get an attorney?") honestly ("Whenever you want one"). (Govt. Exh. 1 at 4:37-46). Thereafter, SA Anderson made certain that the defendant wanted to proceed with the interview, thereby waiving his *Miranda* rights, by asking him if he wanted to answer questions. (Govt. Exh. 1 at 4:47). McGibney showed that he absolutely understood his right *not* to answer questions by telling SA Anderson that [whether he wanted to answer questions] would depend on what questions were asked. (Govt. Exh. 1 at 4:51). SA Anderson then reiterated that McGibney had the right to refuse to answer questions

and made absolutely certain, one last time, that McGibney did not have any questions about his rights before they proceeded further. (Govt. Exh. 1 at 4:53-5:08). McGibney thereafter answered some (but not all) of SA Anderson's questions. He showed that he understood his *Miranda* rights by selectively invoking them when he was asked questions which he did not wish to answer (e.g. questions related to who sold him the gun components). (Govt. Exh. 1 at 11:48-50).

The circumstances of the interview clearly show that that McGibney's waiver was voluntary. The tone of the interview was polite and cordial and much of the interview was between McGibney and just one agent. SA Anderson never yelled at McGibney, threatened him, lied to him or practiced any coercion upon him whatsoever. The interview took place in the visitation area of the LaGrange County Jail, an environment free from coercive influence. It is clear from the interview recording that McGibney is intelligent, was alert during the interview and was not under the influence of drugs or alcohol. (Govt. Exh. 1 at 21:43 ("I just got accepted to U.C. Berkeley"); Tr. at 103). McGibney was clearly able to understand and respond to the questions asked of him. (Govt. Exh. 1). Though Defendant complains that SA Anderson did not specifically ask him when he had last eaten or slept (ECF 80 at 23), there simply was no reason to believe that such inquiries were necessary given McGibney's demeanor during the interview.

The defendant alleges that his question, "When can I get an attorney?" was a clear invocation of his right to counsel. It was not. The defendant compares his question "when can I get an attorney?" to requests for counsel in two cases where

suspects asked law enforcement, "can I [get an attorney]?" in which courts found that those requests constituted an invocation of the right to counsel. The defendant's request is easily distinguishable from these cases. The defendant's question was a temporal inquiry about when he could he exercise the right to counsel, whereas the suspects in the cases cited by the defendant invoked their rights to counsel by asking for an attorney. The distinction is easily explained through use of an analogy. The question "Can I..." is, at least colloquially, understood as a request to do something. For example, if an employee was to ask her supervisor, "Can I take the day off of work?", no one would understand this question to mean that the employee was asking if it would be physically possible for her to take a day off of work. Rather, all would understand that request to mean that the employee was requesting a day off of work at that time. Conversely, if an employee asked her supervisor, "When can I take a day off of work?", the parties would understand the employee to be asking what date would be convenient for her to take a vacation day. At least one other court has held that that language substantially identical to McGibney's question did not constitute a clear invocation of the right to counsel. In *United States v. Mejorado*, the court held that the defendant's questions "when can I see a lawyer" and "when can I get a lawyer" were not invocations of the defendant's right to counsel. No. 14CR930 WQH, 2015 WL 106378 at *7 (S.D. Cal. Jan. 7, 2015).

In this case, after hearing his *Miranda* warnings for the second time that day, including those which advised him of his right to speak with an attorney before answering any questions and to have an attorney with him while answering any

26

questions, McGibney asked TFO Anderson when he could get an attorney. McGibney did not request an attorney, he merely asked when he could get one. TFO Anderson accurately told him that he could get an attorney whenever he wanted one. McGibney did *not* say that he wanted an attorney at that time or that he would prefer to speak with an attorney before answering questions. When TFO Anderson asked thereafter if McGibney wanted to answer his questions, McGibney showed that he understood his rights, specifically his right not answer certain questions, as he told TFO Anderson that his desire to answer questions depended on what questions were asked. McGibney declined to answer some questions and declined to provide consent for a search of his phone. It is clear that McGibney understood his *Miranda* rights and chose to exercise certain of those rights during the interview. He did not clearly and unequivocally invoke his right to counsel at any time during the interview. Because McGibney was properly advised of his *Miranda* warnings, impliedly waived his *Miranda* rights by agreeing to answer (at least some) questions and because he did not unequivocally request the assistance of counsel, McGibney's Fifth Amendment rights were not violated and his statements should not be suppressed.

## C. Search of the Cell Phone

### 1. The Search Procedure did not Violate the Fourth Amendment

A search warrant must describe with particularity the place to be search and the items to be seized. U.S. CONST. AMEND. IV; *Groh v. Ramirez,* 540 U.S. 551, 557 (2004). In order to satisfy this particularity requirement, courts require that officers be able to identify the items to be seized with reasonable certainty. *United States v.*

*Brown*, 832 F.2d 991, 996 (7th Cir. 1987). A search warrant which authorizes the search of premises authorizes police to search everywhere upon the premises where evidence might be located. *See United States v. Bishop*, 910 F.3d 335, 336-37 (7th Cir. 2018). "Applying this rationale to the context of electronic devices, courts have routinely upheld the seizure and copying of hard drives and other storage devices in order to effectuate a proper search for the…files listed in the warrant." *United States v. Alston*, No. 15CR 435 (CM), 2016 WL 2609521 at *6 (S.D.N.Y. Apr. 29, 2016) (internal citations omitted); *see also United States v. Ganias*, 824 F.3d 199, 208-221 (2nd Cir. 2016) (discussing reasoning for copying entire digital media subject to search warrant).

McGibney does not argue that the search warrant (Govt. Exh. 2) was deficient in any way (i.e. that it contained insufficient facts to establish probable cause or that it did not describe with particularity the items to be seized). Rather, McGibney argues that law enforcement exceeded the scope of the seizures allowed by the warrant when they copied the entire contents of the defendant's phone prior to searching the phone and seizing items responsive to the warrant (photos and text messages). However, the government's agents executed the warrant in compliance with the nature of the examination described in the warrant and Federal Rule of Criminal Procedure 41(e)(2)(B), and thus the government's execution of the warrant did not violate any of the defendant's constitutional rights.

In the affidavit for the search warrant, the government provided the nature of its examination of the phone as follows:

28

> Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant requests would permit the examination of SUBJECT PHONE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of SUBJECT PHONE to human inspection in order to determine whether it is evidence described by the warrant.

(Govt. Exh. 2 at 12-13). Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure

provides:

> A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or *copying* of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site *copying* of the media or information, and not to any later off-site *copying* or review.

(emphasis added). Additionally, The Advisory Committee Notes to the 2009

Amendments to Rule 41 provide:

> Computers and other electronic storage media commonly contain such large amounts of information that it is often impractical for law enforcement to review all of the information during execution of the warrant at the search location. This Rule acknowledges a two-step process: **officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant.**
> …
> In addition to addressing **the two-step process inherent in searches for electronically stored information**, the Rule limits the [14] day execution period to the actual execution of the warrant and the on-site activity. While consideration was given to a presumptive national or uniform time period within which any subsequent off-site copying or review of the media or electronically stored information would take place, the practical reality is that there is no basis for a "one size fits all" presumptive period. A substantial amount of time can be involved in the forensic imaging and review of the information.

(emphasis added). It is clear that Rule 41 contemplates the copying of all digital

media on a digital device which is subject to a search warrant, which copy is then subject to later review by government agents to find evidence responsive to the search warrant issued pursuant to the Rule. In searching the defendant's phone, agents did not "flagrantly disregard the terms of the warrant" (ECF 80 at 25) during their search. Rather, the search pursuant to the warrant (Govt. Exh. 2) was executed in accordance with the procedure stated within the affidavit to the warrant, Rule 41(e)(2)(B) and the advisory committee commentary by copying the electronically stored information on the device. The copied information was then, and remains, subject to later review by the government.

SA Kaiser explained why copying the data from the cell phone is a necessary procedure for the search of a digital device. Per SA Kaiser, an expert in digital media collection, if law enforcement were to physically scroll through the device in an effort to search for material responsive to the warrant, they would run the risk of writing new information to the device (thereby potentially tainting evidence), risk causing the device to delete data or risk missing items responsive to the search warrant which have been "deleted" or moved to unallocated space. (Tr. at 135-137). In order to preserve evidence on the device in its original form and ensure that the entire device could be searched, SA Kaiser employed accurate and widely used, read-only software (Cellebrite) to create an exact copy of the data on the phone. (Tr. at 138-39, 154). The Cellebrite software then created a report from the information copied from the phone, which was searchable by agents, who found and seized items responsive to the search warrant. (Tr. at 106-07).

It is certainly true that there were many items on McGibney's phone which were not responsive to the search warrant and which were therefore not seized for use as evidence in the case. Any search of the phone – whether done in an unsophisticated manner by scrolling through the phone's contents or by copying the entire contents of the device – would involve law enforcement seeing items that were not subject to seizure under the search warrant. This is always true when agents execute any search warrant – not just on digital media. For example, agents executing a commonplace search warrant allowing for the seizure of drugs, drug ledgers, money transfer information and evidence of ownership of a home can – and do – search through the entirety of a subject's home, from physical locations like cabinets, drawers and safes, to all of the residents' papers and personal effects, often finding and even photographing many items which are not subject to seizure under the warrant. There is no doubt that such a procedure is permissible under the Fourth Amendment. *See Bishop*, 910 F.3d at 336-37. Just as agents searching a subject's entire home pursuant to a warrant may view personal items which are not responsive to the search warrant in order to find evidence which may be seized, agents in this case had the right to search through all of the files on the defendant's phone to find evidence subject to seizure under the warrant, though it was commingled with other, non-responsive information. *See United States v. Christine*, 687 F.2d 749, 760 (3rd Cir. 1982) ("[N]o tenet of the Fourth Amendment prohibits a search merely because it cannot be performed with surgical precision."). As the Supreme Court has explained, "[i]n searches for papers, it is certain that some innocuous documents will

be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976); *see also United States v. Williams*, 592 F.3d 511, 520 (4th Cir. 2010) (applying *Andresen* to search of computers and digital media). This rule is particularly applicable in the case of files on computers and today's smart phones, "where files may be disguised, relevant documents may be intermingled with irrelevant ones and 'there is no way to know what is in a file without examining its contents.'" *United States v. Fumo*, No. 06-319, 2007 WL 3232112 at *6 (E.D. Pa. 2007) (quoting *United States v. Hill*, 459 F.3d 966, 978 n. 14 (9th Cir. 2006)).

The defendant conflates the copying of data from the phone – a necessary procedure in order to effect the search permitted by the search warrant – with seizure of evidence. Items seized to be used as evidence at trial are only those items which are described in Attachment B to the search warrant. Defendant has cited no cases in which a court has found that the copying of an entire digital medium in order to search for items subject to seizure has been found to be a violation of a defendant's Fourth Amendment rights, and the government is aware of none. Given the ubiquity of the use of this search procedure (copying the entirety of a digital device in order to search for files responsive to a warrant) by law enforcement, the lack of case law disapproving the method is extremely telling. Because the procedure employed by law enforcement agents to search McGibney's phone was in accordance with the language in the search warrant, Rule 41 and the case law, the agents' search did not violate McGibney's Fourth Amendment right against unreasonable searches and

32

there is thus no basis for suppression of the evidence seized from his phone.

### 2. Even if the Court Finds that there was a Problem with the Execution of the Search Warrant, the Good Faith Exception Applies

The government asserts that law enforcement properly conducted a search of the cell phone pursuant to the validly issued search warrant by following the two-step copy and search procedure set forth in Rule 41. However, even if the Court were to determine that the search procedure was somehow flawed, the remedy of suppression would be inappropriate because the officers reasonably relied upon the search procedure set out within the warrant and Rule 41 in conducting the search. The purpose of the exclusionary rule is to deter police misconduct.  Thus, "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," then "excluding the evidence will not further the ends of the exclusionary rule in any appreciable way" because "[e]xcluding the evidence can in no way affect [the officer's] future conduct unless it is to make him less willing to do his duty." *United States v. Leon,* 468 U.S. 897, 920-921 (1984). Suppression of evidence is a "last resort," *Hudson v. Michigan,* 547 U.S. 586, 591 (2006), appropriate only when law enforcement conduct is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States,* 555 U.S. 135, 144 (2009). Here, where government agents followed the procedure set forth in the warrant approved by the Court and the procedure set forth in Rule 41, which procedure has been both explicitly and implicitly approved by many courts

across the country, there has been no deliberate law enforcement conduct of sufficient culpability to justify use of the exclusionary rule.

## IV.   CONCLUSION

WHEREFORE, based on the foregoing, the government submits that none of McGibney's constitutional rights were violated by law enforcement during the traffic stop, custodial interview and search of his cell phone pursuant to search warrant and that there is thus no basis for suppression of any evidence in this case.  For that reason, the government contends that the defendant's First, Second and Third Motions to Suppress, filed in October 2020 as ECFs 28, 29 and 32 should be DENIED.

Respectfully submitted,

GARY T. BELL
ACTING UNITED STATES ATTORNEY

By:      */s/ Sarah E. Nokes*
Sarah E. Nokes
Assistant United States Attorney
E. Ross Adair Federal Bldg.
& U.S. Courthouse
1300 S. Harrison Street, Room 3128
Fort Wayne, IN 46802-3489
Telephone: (260) 422-2595
Facsimile:  (260) 426-1616
E-mail Address: sarah.nokes@usdoj.gov