UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:20-CR-42-HAB-SLC |
| | ) | |
| ADAM D. McGIBNEY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF HIS PENDING MOTIONS TO SUPPRESS REGARDING STOP OF AUTOMOBILE, STATEMENTS OBTAINED IN VIOLATION OF DEFENDANT'S RIGHTS UNDER *MIRANDA V. ARIZONA* AND EVIDENCE SEIZED AS A RESULT OF EXECUTING WARRANT ON DEFENDANT'S CELL PHONE**

Comes now Defendant Adam D. McGibney, by counsel, to file his Reply Brief in Support of his consolidated Motions to Suppress (ECF Nos. 28, 29, and 32) as follows:

**I.    Trooper Youpel's Traffic Stop of Mr. McGibney's Automobile Violated Mr. McGibney's Rights Under the Fourth Amendment**

Trooper Youpel's traffic stop violated Mr. McGibney's rights under the Fourth Amendment because Trooper Youpel did not have probable cause to stop Mr. McGibney's automobile for any traffic violations under the Indiana Code. Trooper Youpel's testimony at the February 12, 2021 evidentiary hearing made clear that there was no credible basis for stopping Mr. McGibney. Where the officer initiating the arrest is not credible, there is "no probable cause for the stop in the first place." *See United States v. Rogers*, 2006 U.S. Dist. LEXIS 98964, at *15 (S.D. Ind. Dec. 20, 2006).

The government bears the burden of proving by a preponderance of the evidence that reasonable suspicion supported the traffic stop. *See United States v. Peters*, 743 F.3d 1113, 1116 (7th Cir. 2014). But in its Response, the government failed to rehabilitate Trooper Youpel's testimony and failed to respond to any of the case law cited in defendant's opening brief regarding incredible witness testimony. *See, e.g., United States v. Simon*, 937 F.3d 820, 831 (7th Cir. 2019) (the court considers the officer's testimony, demeanor, and appearance when determining credibility). Beyond simply stating that Trooper Youpel was a credible witness, the government does not take issue with the controlling law cited in the opening brief or present any authority supporting its position that the Court should deny Mr. McGibney's pending motions notwithstanding Trooper Youpel's incredible testimony. The government has not met its burden, and the Court should therefore grant Mr. McGibney's motion to suppress.

### A. **Trooper Youpel is Not a Credible Witness, and the Court Should Not Credit His Uncorroborated Testimony Regarding the Alleged Traffic Violations**

This Court has already determined that there are "grave concerns" about Trooper Youpel's credibility. [*See* ECF 70 at 5]. The government's Response does nothing to invalidate the Court's well-founded concerns based on Trooper Youpel's inconsistent, unsupported, and uncorroborated testimony at the February 12, 2021 suppression hearing.

The government's Response resorts to suppositions unsupported by the record in an attempt to rehabilitate Trooper Youpel's credibility. For example, the government asserts that "the reflective, white lane divider line would have been easy to see" at midnight when Trooper Youpel allegedly viewed Mr. McGibney's first lane change. Gov't Resp. at 13 (citing H.T.[1] at 13). There is nothing in the hearing transcript (or elsewhere in the record) to establish the color of the lane divider markings on the stretch of highway where Mr. McGibney was pulled over,

---

[1] "H.T." refers to the hearing transcript of testimony received by the Court on February 12, 2021.

nor is there anything in the record to establish that the markings were reflective and, therefore, easily visible. The government cannot bolster the testimony of Trooper Youpel to make him into a more credible witness.

The government also attempts, unsuccessfully, to explain away various inconsistencies in Trooper Youpel's testimony. The government admits that Trooper Youpel was an inexperienced officer at the time of the July 2020 traffic stop of Mr. McGibney (Gov't Resp. at 20), and acknowledges that Trooper Youpel "displayed confusion as to the interplay between" the statute under which he wrote Mr. McGibney's ticket (Ind. Code § 9-21-8-24) and the statute with the 300-foot signaling requirement (Ind. Code § 9-21-8-25). Disputing Trooper Youpel's own testimony that Mr. McGibney *did not* violate Section 9-21-8-24 of the Code, the government argues in its Response that Mr. McGibney did, in fact, violate that section. The government's assertion is unsupported by the record. The government claims that Section 9-21-8-24 requires that a driver "give a visible or audible signal before" changing lanes. Gov't Resp. at 13. But under the statute, a driver must give an audible signal only if a "pedestrian may be affected by the movement," and must otherwise signal "if any other vehicle may be affected by the movement." Ind. Code § 9-21-8-24. There is nothing in the record to suggest that there were any pedestrians on the Toll Road at the time of the alleged violations, nor is there anything to suggest that Mr. McGibney's first lane change may have affected another vehicle. Trooper Youpel could not even remember if he was directly behind Mr. McGibney in the right lane or offset in the left lane when Mr. McGibney first changed lanes. (H.T. at 43:16-20). In addition, Trooper Youpel testified that he was 100-150 feet behind Mr. McGibney when he observed the alleged traffic violations. (H.T. at 53:15). At that distance, if true, Trooper Youpel's vehicle would not have been affected by Mr. McGibney's lane change, as the statute requires. Further, there is no

testimony in the record that there were any other cars behind Mr. McGibney that could have been "affected by the movement." In sum, the government's attempt to justify the traffic stop under Ind. Code § 9-21-8-24 is unsupported by the record and is *directly contradicted* by the government's only witness of the traffic stop.

The government also argues that Trooper Youpel's "estimations" of the distance traveled by Mr. McGibney are credible, and that such "estimations" are appropriate lay witness testimony. However, Federal Rule of Evidence 701 requires that any opinion of a lay witness must be "rationally based on the perception of the witness." Fed. R. Evid. 701. In support of Trooper Youpel's distance testimony, the government cites to *Guerra v. United States,* 2019 U.S. Dist. LEXIS 226485, at *4 (W.D. Tex. Nov. 15, 2019) for the proposition that "[m]easuring distance is an experience familiar to everyday life and is not limited to specialists." However, *Guerra* involved a border patrol agent who intended to testify regarding the distance traveled by a vehicle "as captured on the video of the accident." *Id*. The agent "reviewed the video and *measured* the distance traveled using both Google Earth and manually using a measuring wheel." *Id.* (emphasis added). To be sure, measuring physical distance using a measuring wheel or tape, or a software tool like Google Earth with a distance measurement feature, is "an experience familiar to everyday life and is not limited to specialists." *Id.* In this case, however, Trooper Youpel did not perform *any* measurement of distance, and articulated no rational basis for his opinions regarding the distance that Mr. McGibney's vehicle traveled. Trooper Youpel could only testify as to how many times he recalled the turn signal blinking, not how long it was activated. (H.T. 52:1-7 ("Q: Three or 4 seconds? A: Whatever the – I would say it was only on to the point to where it blinked 3 or 4 times.")). The number of times a turn signal blinks is not a rational or accepted basis for measuring distance, as Rule 701 requires. Distance traversed is a

4

function of speed and time. Trooper Youpel did not gauge the distance traveled by Mr. McGibney's car by reference to stationary landmarks, and he did not know approximately how many seconds it would take to traverse 300 feet for a vehicle traveling 70 miles per hour on the Toll Road. In addition, Trooper Youpel had no dash camera or body camera video, or any other evidence, to corroborate his testimony.[2] (H.T. 55:10-19; 56:13:20; 58:13-22; 60:1-9).

Courts in the Seventh Circuit have frequently used dash or body camera footage to corroborate the testimony of officers during traffic stops. *See, e.g.*, *United States v. Thompkins*, 2019 U.S. Dist. LEXIS 91275, at *16 (N.D. Ill. May 31, 2019) (finding reasonable basis for traffic stop where the officer's testimony was "further corroborated by the dash camera footage that was captured as the officers passed Thompkins' vehicle."). The absence of corroborating evidence weighs against a finding of probable cause for a traffic stop. *Cf. United States v. Griffin*, 2018 U.S. Dist. LEXIS 175167, at *17 (E.D. Wis. Oct. 11, 2018) ("while there is no body camera evidence to corroborate [the officer's] version of events, there *is* corroborating evidence [from another officer]. This is not a case where the court must rely solely on [one officer's] testimony to conclude that the officers had probable cause to stop the defendant.").

In this case, there is no corroborating evidence for Trooper Youpel's testimony; instead, his testimony was directly contradicted by the testimony of Mr. McGibney. Mr. McGibney testified that he saw Trooper Youpel's marked police car pull out behind him. (H.T. 162:13-24; 163:1-3). Noting that a police officer was behind him, Mr. McGibney testified that he signaled for at least six seconds before initiating each lane change. (H.T. 164:11-25; 165:1-3).

---

[2] In August 2020, Indiana Governor Eric Holcomb ordered Indiana State Police to adopt body cameras by Spring 2021. *See* John Boyle, *Gov. Holcomb Orders Indiana State Police To Use Body Cams By Next Year*, WFPL.ORG (Aug. 19, 2020), https://wfpl.org/gov-holcomb-orders-indiana-state-police-to-use-body-cams-by-next-year/. A statement from the Indiana State Police affirmed that "the State Police will use [body cameras] to their fullest capabilities as they provide law-enforcement services in all 92 Indiana counties." *Id.*

It is the government's burden to prove that reasonable suspicion supported the traffic stop. *Peters*, 743 F.3d at 1116. The only evidence for the traffic stop is the uncorroborated, controverted, and non-credible testimony of Trooper Youpel. The government has failed to meet its burden.

### B. Mr. McGibney was the More Credible Witness

The government argues unconvincingly that Mr. McGibney's inability to remember mundane, insignificant details about his cross-country trip should cast doubt upon his testimony about the details of his traffic stop. In particular, the government criticizes Mr. McGibney's "morass of . . . forgetfulness" simply because he did not recall: (1) the town he had stayed in the night before the traffic stop; (2) the rest stops he visited along his trip; and (3) the details of any other lane changes on his trip.[3] These arguments are specious. The Toll Road is a limited access highway. An individual can travel on the Toll Road indefinitely by stopping for gas and to rest at Toll Road rest stops. It is reasonable that a driver traveling cross-country on the Toll Road would not remember the name (if any) of each travel plaza or rest stop he or she stopped at, or the details of a routine lane change. On the other hand, it is reasonable that a driver would take note of and remember a fully-marked police cruiser parked in the median of the Toll Road, as Mr. McGibney testified. (H.T. 162:13-24; 163:1-3). Furthermore, it is reasonable for a driver to take note when a fully-marked police cruiser pulls out behind him or her, and for such driver to be on

---

[3] The government also states that Mr. McGibney "could not have been traveling on I-80 at the time of his alleged rest stop on the South Dakota/Minnesota border as he initially testified (Tr. at 166), as that interstate does not travel through either of those two states." Gov't Resp. at 6. This is a mischaracterization of Mr. McGibney's testimony, as he testified that it was "either 80 or the 90." (H.T. at 166:20). I-90 does cross the South Dakota/Minnesota border, which is consistent with Mr. McGibney's testimony. *See* https://maps.google.com. Mr. McGibney's uncertainty is understandable because I-80 and I-90 comprise the longest interstate highway concurrency in the United States, and are joined for 265 miles across Indiana and Ohio. *See* Federal Highway Administration, "Table 1: Main Routes of the Dwight D. Eisenhower National System of Interstate and Defense Highways as of December 31, 2018", *Route Log and Finder List* (May 6, 2019),
https://www.fhwa.dot.gov/planning/national_highway_system/interstate_highway_system/routefinder/table01.cfm.

"high alert" while followed by the police cruiser. When Mr. McGibney was pulled over within minutes of passing the police cruiser, and was subsequently arrested and incarcerated as a result of the traffic stop, it is reasonable that Mr. McGibney would clearly remember the immediate series of events that led up to the traffic stop, the first arrest of his life, and being arrested for two state level felonies he did not commit.

    Next, the government argues that because Mr. McGibney didn't display "excited behavior" during the traffic stop, Mr. McGibney's situation "was not stressful enough" for it to have been a "trigger for his crystal-clear memory of turn signal timing." Gov't Resp. at 21-22. This argument is nonsensical. Mr. McGibney's "calm" and "monotone" demeanor is very consistent with a stress response. People react differently to stressful events—evidenced by the common phrase "fight or flight"—and the government's attempt to discredit Mr. McGibney based on his outwardly "calm" stress response is meritless. The government cites no case law or psychological studies equating calmness with evidence of guilt. Conversely, as Trooper Youpel himself acknowledged, Mr. McGibney's calm demeanor was consistent with his military training and nearly six years of service in the United States Marine Corps. (H.T. at 105:1-4; Custodial Interview at 3:22-24). During the February 12, 2021 hearing, Trooper Youpel admitted that military personnel "are trained to be calm in stressful situations." (H.T. at 36:22-24). Trooper Youpel further admitted that Mr. McGibney's calmness under pressure was not surprising given his military training and experience. (H.T. at 37:14-18). Had Mr. McGibney appeared nervous, the government would have certainly attempted to assert that as evidence of a guilty conscience. In short, the government's argument that Mr. McGibney's calmness somehow corroborates Trooper Youpel's traffic stop and arrest is rebutted by the very testimony of Trooper Youpel. At the time Mr. McGibney was pulled over, he had no criminal record and had never been arrested.

(H.T. 113:24-25; 114:1-3). Mr. McGibney's traffic stop on July 19, 2020—followed by his subsequent arrest, interrogation, and months-long detention far away from home—was a novel and stressful event, which triggered Mr. McGibney's clear memory of the events immediately preceding the stop.

The government also chides Mr. McGibney because he "never complained to SA Anderson that he believed he had been pulled over erroneously." Gov't Resp. at 22. "If the bases of the traffic stop were as egregiously false as McGibney now claims them to have been, it would have been natural for him to at least mention that to SA Anderson during the cordial discussion they had about the events of the stop." *Id.* This argument fails for at least three reasons. First, Mr. McGibney was not arrested, charged, and detained for any purported traffic violation, so the facts related to the traffic stop were not immediately pertinent to the offenses with which Mr. McGibney was charged. Second, Mr. McGibney is not an attorney, and a defendant's failure to raise specific facts during an interrogation that may be relevant to a legal defense asserted in the future is not evidence of guilt. Third, from the outset of the interview, SA Anderson clearly insinuated that he was there to clear up the erroneous firearms charges: "I got called—there was some confusion I think—the trooper that stopped you may be charging you with some things you shouldn't be charged with . . ." (Custodial Interview at 3:44). Because SA Anderson identified himself as an ATF Task Force Officer and stated that he wanted to clear up confusion regarding the erroneous firearms charges—the basis for Mr. McGibney's arrest—Mr. McGibney would have had little reason to mention any issues regarding the initial traffic stop.

In contrast to the uncorroborated, controverted, and non-credible testimony of Trooper Youpel, Mr. McGibney's testimony was credible and believable. The Court should credit his testimony.

**II.     SA Anderson's Questioning Violated Mr. McGibney's Rights Under *Miranda v. Arizona* and Require Suppression of Any Statements That Followed**

SA Anderson's questioning violated Mr. McGibney's rights and should be suppressed, because Mr. McGibney invoked his right to counsel. Without any authority supporting its argument, the government attempts to dismiss Mr. McGibney's unequivocal invocation of his right to counsel as a mere "temporal" inquiry. Gov't Resp. at 26. The government attempts to distinguish Mr. McGibney's unambiguous request for counsel ("When can I get a lawyer?") from similar invocations that have consistently been found adequate by courts in the Seventh Circuit and elsewhere—but the logic of the government's proposed analogy betrays its argument.

The government attempts to distinguish two questions: "Can I take the day off of work?" and "When can I take a day off of work?" Gov't Resp. at 26. But both of these questions convey the same base message—the employee wants to take a day off work. Both questions clearly imply the employee's desire to take a day off work. *Cf. United States v. Hunter*, 708 F.3d 938, 943 (7th Cir. 2013) (a statement is sufficient to invoke the right to counsel if it indicates "a certain and present desire to consult with counsel"). Both questions utilize the decisive word "can" to request a day off. *See id.* at 944. Both request an action or permission to act; they are not merely observations about requesting time off. *See United States v. Hampton*, 885 F.3d 1016, 1019-20 (7th Cir. 2018); *cf. United States v. Shabaz*, 579 F.3d 815, 818 (7th Cir. 2009) (finding the question "am I going to be able to get an attorney?" did not unambiguously indicate suspect was asking for counsel).

For all these same reasons, it follows that if the question "Can I get a lawyer?" is a "direct request for a lawyer," *United States v. Wysinger*, 683 F.3d 784, 795 (7th Cir. 2012), then so too is the question "When can I get a lawyer?" Interpreting Mr. McGibney's statement "as ordinary people would understand it," and giving "a broad, rather than a narrow, interpretation to

9

a defendant's request for counsel," as required under Supreme Court precedent, it is clear that Mr. McGibney unambiguously invoked his right to counsel during his interrogation. *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987).

The government, in contrast, urges a narrow interpretation of Mr. McGibney's request for counsel. In support of that argument, however, the only authority cited by the government is an unpublished case from the Ninth Circuit that is easily distinguishable from the facts of Mr. McGibney's interrogation.[4] In *United States v. Mejorado*, 2015 U.S. Dist. LEXIS 1588, at *2 (S.D. Cal. Jan. 7, 2015), the defendant asked the interrogating agent, "Okay, when can I see a lawyer?" In response, the agent, adhering to the Supreme Court's recommended practice, followed up and clarified whether the suspect was invoking his right to counsel. *Id.* at *2-3 ("So, do you want one?"). The suspect then unambiguously made clear he was *not* invoking his right to counsel and was merely weighing his options—"Wait, no. I'm asking you first." *Id.* at *3. It was objectively clear from his clarification that the suspect in *Mejorado* was weighing his options, not invoking his right to counsel. *See United States v. Wysinger*, 683 F.3d 784, 795 (7th Cir. 2012) (an asker "contemplating whether he is in need of the services of a lawyer" has not invoked his right to counsel). Nonetheless, the agent in *Mejorado* followed best-practices and followed-up on what appeared, on its face, to be an invocation of counsel. *Mejorado*, 2015 U.S. Dist. LEXIS 1588 at *2-3; *Wysinger*, 683 F.3d at 795 (encouraging police officers to clarify whether or not the suspect actually wants an attorney); *see also United States v. Lee*, 413 F.3d 622, 626 (7th Cir. 2005) (finding that "unless the police obtained further clarification from [the suspect]," his question "Can I have a lawyer?" was a proper invocation of his right to counsel).

---

[4] The government has not presented any Seventh Circuit precedent, controlling or persuasive, to support its argument.

10

Here, SA Anderson made no such follow-up inquiry and proceeded to question Mr. McGibney despite his unambiguous invocation of his right to counsel.

Mr. McGibney's request, on its face, was unambiguous; but his invocation is further supported by its context. *See United States v. Shabaz*, 579 F.3d 815, 819 (7th Cir. 2009) ("[The] analysis does not end with words alone; as in our previous cases, we also consider the circumstances in which the statement was made."). Mr. McGibney's statement came after SA Anderson had begun his interrogation. *See Hunter*, 708 F.3d at 945. Mr. McGibney never signed a form waiving his right to counsel nor did he orally waive his rights. (H.T. 115:7-11, 115:19-22).

SA Anderson should have halted the interrogation following Mr. McGibney's unambiguous request for counsel. Because SA Anderson did not, Mr. McGibney's statements following his invocation of his right to counsel should be suppressed.

### III. The Government's Search of Mr. McGibney's Cell Phone was Overbroad and Cannot be Saved by an Unsupported Claim of Acting in "Good Faith"

In its response, the government acknowledges that its search of Mr. McGibney's cell phone resulted in the extraction of materials that were beyond those permitted by the search warrant issued in this matter. *See* Gov't Resp. at 31. In an effort to save evidence seized by this overbroad search, the government advances several arguments, none of which are persuasive. It asserts the search and seizure comported with what was allowed by the search warrant. This argument is simply not accurate. Next, it asserts that its "seizure" of data only amounted to a "search," but this too is unavailing. Finally, acknowledging that its seizure of data from Mr. McGibney's phone may have violated both the search warrant and Mr. McGibney's constitutional rights, the government seeks to salvage the fruits of its illegal actions through an

unsupported claim of good faith. For the reasons stated below, the government's arguments fail on all fronts.

    A.    **<u>The Government's Extraction of Data from Mr. McGibney's Phone was Done in Violation of the Search Warrant Issued in this Matter.</u>**

The Fourth Amendment provides that warrants may issue, but only upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized. U.S. Const. amend. IV; *United States v. Buckley,* 4 F.3d 552, 555 (7th Cir. 1993). The search warrant in this matter allowed law enforcement officials to search a specific cell phone identified in Attachment A to government's Exhibit 2, admitted into evidence by stipulation during the evidentiary hearing held before the Court. The government's authority to seize evidence from Mr. McGibney's phone was limited to those items identified in Attachment B to the Warrant (Exh. 2):

1. All records on SUBJECT PHONE described in Attachment A, that relate to violation(s) of 26 U.S.C. 5841, 5861(d) and (e) from in or about 2018 through July 20, 2020 involving Adam D. McGIBNEY including:
    a. Any records or information containing communications, including, but not limited to, in-coming test messages, voice calls and emails, including, but not limited to, any communications related to the transfer of an AR-15-style short-barrel rifle or its constituent parts and price(s) paid or to be paid in such transaction(s) as well as dates and places of specific transactions;
    b. Any information related to sources of firearms or their constituent parts (including names, addresses, phone numbers, or any other identifying information);
    c. Any digital image or video recording of firearms or firearms transactions, including, but not limited to, an AR-15-style short-barrel rifle or its constituent parts;

2. Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as legs, phonebooks, saved usernames and passwords, documents, and browsing history;

    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This language was limiting in nature and did not allow for the wholesale seizure of all data stored on Mr. McGibney's cell phone. This is significant and comports with recent holdings of the United States Supreme Court recognizing that "a cell phone search would typically expose to the government far more than the most exhaustive search of a house." *Riley v. California,* 573 U.S. 373, 396-97 (2014).

Contrary to the assertion in its response, government agents did not comply with the dictates of Criminal Rule 41 in the execution of the search warrant. Pursuant to Criminal Rule 41(e)(2)(B), "A warrant under Rule 41(e)(2)(A) **may** authorize the seizure of electronic storage media or the seizure or copying of electronically stored information." *Id.* (emphasis added). Thus, while a warrant "may" authorize copying of electronically stored information, it does not do so automatically and did not do so in this instance. Moreover, per Rule 41(e)(2), "[T]he warrant must identify the person or property to be searched, identify any person or property to be seized, and designate the magistrate judge to whom it must be returned." In this case, as set forth above, the warrant identified the limited data which could be seized from Mr. McGibney's phone; however, it did not provide authority for an extraction of data beyond the items specifically authorized for seizure. It did not allow for the full data seizure executed by SA Kaiser utilizing the Cellebrite software.

The authority cited by the government to defend its overbroad seizure of data from Mr. McGibney's cell phone is inapt for a variety of reasons. For example, in *United States v. Bishop,* 910 F.3d 335 (7th Cir. 2018), the Court held that a warrant was valid where it allowed police to *search* everywhere the evidence designated by the warrant could be found. However, the court did *not* discuss—much less authorize—the *seizure* of all materials in the location being searched. Similarly, the warrant herein allowed for the search of Mr. McGibney's phone for certain

particularized data set forth therein. It did not allow for the wholesale seizure of all data contained on the phone.

Next, the government relies on dicta from *United States v. Ganias,* 824 F.3d 199 (2d Cir. 2016), a Second Circuit case in which the court specifically stated that its decision was *not* based on the issue of seizing electronically stored data. In *Ganias*, the court cautioned, "We conclude, moreover, that we should not decide this question on the present record, which does not permit a full assessment of the complex and rapidly evolving technological issues, and the significant privacy concerns, relevant to its consideration. Having noted Ganias's argument, we do not decide its merits." *Id.* at 220-21.

While the government's response may speak well regarding authority of courts to occasionally allow for mirroring of electronically stored data as part of a search warrant, such authorizations for broad seizures of electronic data are often coupled with various conditions to protect the constitutional rights of the individual(s) whose data is to be searched and seized in such a broad manner. In *United States v. Comprehensive Drug Testing, Inc.,* the Ninth Circuit, *en banc*, addressed the need to provide specific protections when a search warrant specifically allows for the excess seizure of electronic data, holding, "Everyone's interests are best served if there are clear rules to follow that strike a fair balance between the legitimate needs of law enforcement and the right of individuals and enterprises to the privacy that is at the heart of the Fourth Amendment." 579 F.3d 989, 1006 (9th Cir. 2009) (CDT II), *opinion revised and superseded on other grounds,* 621 F.3d 1162 (2010) (CDT III). The Court further found, "The process of segregating electronic data that is seizable from that which is not must not become a vehicle for the government to gain access to data which it has no probable cause to collect." *Id.* To that end, the Ninth Circuit held

that search warrants authorizing overbroad seizures of electronic data should include the following search/seizure protocols:

1. The government must waive reliance upon the plain view doctrine in digital evidence cases. *Id.* at 997-98, 1006.

2. Segregation and redaction must be either done by specialized personnel or an independent third party. If the segregation is to be done by government computer personnel, it must agree in the warrant application that the computer personnel will not disclose to the investigators any information other than that which is the target of the warrant. *Id.* at 1000-01, 1006.

3. Warrants and subpoenas must disclose the actual risks of destruction of information as well as prior efforts to seize that information in other judicial fora. *Id.* at 1003-04, 1006.

4. The government's search protocol must be designed to uncover only the information for which it has probable cause, and only that information may be examined by the case agents. *Id.* at 999-1001, 1006.

5. The government must destroy or, if the recipient may lawfully possess it, return non-responsive data, keeping the issuing magistrate informed about when it has done so and what it has kept. *Id.* at 1000-01, 1006.

In the revised and superseding opinion (CDT III), the Court reaffirmed the need for specialized procedures for the handling of seized electronic data. 621 F.3d at 1168-69. The *en banc* panel also maintained the view outlined in the original appellate decision that "[t]he process for segregating electronic data that is seizable from that which is not must not become a vehicle for the government to gain access to data which it has no probable cause to collect." *Id*. at 1177; *see also In Re Search of Information Associated with the Facebook Account Identified by the Username Aaron Alexis*, 21 F. Supp. 3d 1, 8-11 (D.D.C. 2013) (recognizing the need for specialized protocols to protect against overseizure and review of electronic data).

Police may not exceed the terms of the authorizing search warrant when conducting a search. *Marron v. United States,* 275 U.S. 192, 196-97 (1927). In this matter, federal authorities were limited in the data they could forensically seize from Mr. McGibney's cell phone. Rather

than tailoring their seizure to the clear, unambiguous, limitation set forth in the search warrant, SA Kaiser admittedly engaged in a general search of the phone when he conducted a bit-for-bit physical extraction of all data contained on the phone (H.T. 131:2-9; 134:6-25), creating an almost "one-for-one copy of the live operating system" of the cell phone. (H.T. 139: 10-12.) When asked whether "any personal stuff that had nothing to do with these [items identified in Attachment B of the warrant] would likely have been extracted from the phone as well," SA Kaiser answered "Yes, that's correct," directly confirming the overbroad and unconstitutional nature of his seizure of data from Mr. McGibney's cell phone. (H.T. 146:1-4.)

> B. **<u>Extraction of Data from a Personal Cell Phone is a "Seizure" as defined by Law.</u>**

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." As the Supreme Court recognized in *California v. Hodari D*, "[f]rom the time of the founding to the present, the word 'seizure' has meant a 'taking possession.'" 499 U.S. 621, 624 (1991). The Court's view has not changed over time. *See Pelham v. Rose,* 76 U.S. 103, 106-07 (1870) ("To effect [a] seizure" of something, one needed "to take" the thing "into his actual custody and control.").

The government attempts to redefine the word "seize/seizure" to avoid responsibility for its overbroad seizure of data from Mr. McGibney's phone. This very exercise in definitional double talk belies the government's improper seizure in this case. The text of the Fourth Amendment uses the word "seizures" once in connection with multiple objects—persons, houses, papers, and effects. This suggests clear parity of meaning, not disparity, as the government suggests. Further, courts cannot give a single word different meanings depending on

the happenstance of "which object it is modifying." *Reno v. Bossier Parish School Bd.,* 528 U.S. 320, 329 (2000).

The government's attempt to analogize the search of a house to its seizure of every bit of data on Mr. McGibney's cell phone cannot be reconciled with long-held Fourth Amendment jurisprudence, as outlined above, or simple logic. Like the house described in the government's argument, SAs Anderson and Kaiser could have reviewed the cell phone and any folders, files, etc. that may have contained data responsive to the limited scope of the search warrant. Rather than do that, however, they chose to extract and seize a bit-by-bit image of the phone—in other words, a seizure of the phone's contents in their entirety. This would be akin to lifting the house onto a trailer and taking it back to an ATF warehouse. The "commonplace search warrant" (Gov't Resp. at 31) would not have authorized this.

While the language used by SA Anderson in his affidavit for the issuance of the warrant may have been an attempt to gain authorization for an overbroad search of the cell phone, this is not what the warrant ultimately authorized. The warrant authorized a search of the phone for limited specific items that could be seized if found. It did not authorize the wholesale seizure of a bit-by-bit copy of all data on the phone. What SA Anderson may have been hinting at in terms of the data he wanted to seize in his affidavit is of no import. The warrant, not the affidavit, provides the scope of authority for the search and any resulting seizure of evidence. In this case, the seizure that took place well exceeded that authorized by the warrant. As such, all data seized through the government's search of McGibney's cell phone should be suppressed.

C. **Efforts to Save the Government's Illegal Seizure of Data from Mr. McGibney's Phone by Asserting "Good Faith" are Unsupported by the Evidence Received by the Court.**

In this case, the search warrant clearly and unambiguously delineated the limited type of data the government could seize from Mr. McGibney's cell phone by law enforcement officials.

17

Despite this, SA Kaiser violated the terms of the warrant when he seized a bit-by-bit copy of all data on the phone, providing an almost "one-for-one copy of the live operating system" to authorities when he was not authorized to do so. SA Kaiser did so despite knowing Mr. McGibney's personal data, unrelated to the items the warrant authorized him to seize, would be extracted from his phone. His actions do not support the "good faith" exception asserted by the government in an effort to save this overbroad and illegal seizure.

The "good faith" exception applies to circumstances where an "officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acting within its scope . . ." seizes evidence only to later learn the warrant was somehow defective. *United States v. Leon,* 468 U.S. 897, 920-21 (1984). The exception does not apply to a seizure that exceeds the scope of the warrant. *United States v. Grisanti,* 943 F.3d 1044, 1051 (7th Cir. 2019). As the government correctly points out in its response, Mr. McGibney does not assert that the search warrant was deficient. Gov't Resp. at 28. As such, *Leon* and its progeny do not apply to the situation before the Court because Mr. McGibney argues the execution of the warrant was the illegality that should result in suppression of all data seized from his cell phone.

**IV.**     **Conclusion**

For the reasons stated in Mr. McGibney's original motion and his reply, the Court should grant Mr. McGibney's Motion to Suppress Regarding Stop of Automobile (ECF No. 28), Motion to Suppress Alleged Statements Obtained in Violation of Defendant's Rights under *Miranda v. Arizona* and Related Constitutional Guarantees (ECF No. 29), and Motion to Suppress Evidence Seized as a Result of Executing Warrant on Defendant's Phone (ECF No. 32). The Court should also suppress all evidence obtained during and after the illegal stop of Mr. McGibney's automobile pursuant to the Fruit of the Poisonous Tree Doctrine.

Dated: June 9, 2021                              Respectfully submitted,

                                                  BARNES & THORNBURG LLP

*/s/George E. Horn, Jr.*
George E. Horn, Jr. (11721-71)
Michael S. Bergerson, Jr. (35976-46)
201 S. Main St., Suite 400
South Bend, Indiana 46601
Telephone: (574) 233-1171
ghorn@btlaw.com
mbergerson@btlaw.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that on the 9th day of June, 2021, service of a true and accurate copy of the foregoing was served on the United States Attorney via the Court's ECF system.

BARNES & THORNBURG LLP

*/s/ George E. Horn, Jr.*