UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cause No. 1:20-CR-42-HAB |
| ) | |
| ADAM D. McGIBNEY ) | |

**OPINION AND ORDER**

Defendant was pulled over for an alleged traffic violation during the overnight hours of July 19–20, 2020, while driving on the Indiana Toll Road. That stop resulted in the discovery of a short-barreled rifle ("SBR") in the trunk of Defendant's vehicle. At a subsequent custodial interview, Defendant admitted his ownership of the SBR, admitted that he knew the barrel was shorter than sixteen inches, and further admitted that the SBR was not registered with the ATF/NFRTR. Law enforcement also obtained a warrant to search Defendant's cell phone, and the resulting search uncovered evidence indicating Defendant's membership in a right-wing terrorist group. None of the foregoing is contested by the parties.

Now before the Court are three motions to suppress filed by Defendant seeking to suppress evidence discovered because of the traffic stop, Defendant's statements during the interview, and evidence retrieved from Defendant's cell phone. (ECF Nos. 28, 29, 32). This Court held an evidentiary hearing on the motions on February 12, 2021. Post-hearing briefing on the motions is now complete. (ECF Nos. 80, 84, 87).[1] This matter is now ripe for determination.

---

[1] The Court wishes to thank Attorney George Horn, Jr., and Assistant United States Attorney Sarah Nokes for their exceptional advocacy both at the evidentiary hearing and in the post-hearing briefs. Their professionalism has greatly assisted the Court in analyzing the issues presented.

A.      **Factual Background**

Defendant was stopped by Trooper George Youpel ("Youpel") of the Indiana State Police. At the time of the stop, Youpel was a probationary trooper, having only recently joined the force. Youpel did, however, have law enforcement experience prior to joining the ISP: he served as a deputy with the Steuben County Sheriff's Department for approximately two years.

Youpel testified extensively about his law enforcement training. During his employment with Steuben County, Youpel completed a three-month course at the Indiana Law Enforcement Academy in addition to annual firearms training and "a few special trainings." The training requirements increased significantly when Youpel joined the ISP. There, Youpel completed a six-month course at "the academy" in Indianapolis. This was a full-time, five-days-a-week training in "criminal law, traffic law, physical training, [and] all the training that [the ISP] want[s] to offer." Youpel was tested on his knowledge at the conclusion of the ISP academy training and passed those tests. ISP troopers also get ongoing training, at least one hundred hours per year, in various topics including mental health, firearms, physical fitness, and updates to criminal and traffic laws.

In July 2020, Youpel was assigned to patrol the Indiana Toll Road in northeast Indiana. Specifically, Youpel's assigned patrol area was from the 114-mile marker to the Ohio state line, which Youpel testified was the "156.6" mile marker. However, Youpel's post was at Exit 96, or, as Youpel testified, the "96.2-mile marker," so it was not unusual for him to venture outside of his patrol area. Youpel patrolled the area in a fully marked police cruiser and in full uniform. Despite being a probationary officer, Youpel patrolled on his own, without a partner or supervising trooper.

At this point, the versions of events depart significantly. As such, the Court will present the parties' versions separately.

1.  *Youpel's Version*

Youpel did not initially recall where he was when he first spotted Defendant's vehicle. He initially testified that he "could have" been sitting in the median of the Toll Road but, after reviewing his report, testified that he was traveling eastbound on the Toll Road. Youpel could not recall how long he had been following Defendant before observing the alleged infractions. Youpel could also not recall whether he was directly behind Defendant or whether he was traveling in the left lane when he observed the alleged infractions. Nonetheless, Youpel testified that he observed Defendant change lanes from the right eastbound lane to the left, a maneuver Defendant made to pass a slow-moving semi-truck. Defendant did not activate his turn signal until he was halfway through the lane change.

After Defendant passed the semi, he reactivated his turn signal and returned to the right lane. Youpel testified that Defendant's use of the turn signal was "very quick." Youpel was behind the semi at this point, approximately 150 feet behind Defendant's vehicle. Youpel testified that Defendant did not, during either lane change, "signal continuously the intent to change lanes for 300 feet prior to making the lane change." However, Youpel concedes that he did not measure the distances involved and, while he testified that he could judge distance from landmarks, he "kept [his] eyes on the vehicle the whole time."

2.  *Defendant's Version*

According to Defendant, he spotted Youpel's police cruiser sitting in the median of the Toll Road. As Defendant passed, the cruiser pulled out to follow him. Youpel followed Defendant for approximately ten miles before Defendant came upon the semi-truck. With a fully marked police cruiser only a few car-lengths behind him, Defendant made sure to use his turn signal for "at least . . . 6 seconds" before he made his lane changes.

3

Now, back to the undisputed facts. The alleged violations occurred at the 108.3-mile marker. Youpel then followed Defendant for an additional two miles before stopping Defendant's vehicle at the 110-mile marker. Defendant pulled over promptly. Youpel approached Defendant's vehicle and asked for Defendant's license and registration. As Defendant reached into the passenger-side glove box to retrieve the registration, Youpel noticed a bulge on Defendant's right hip that Youpel believed was a firearm. Youpel then asked Defendant if there were any weapons in the vehicle and Defendant admitted that, in fact, the bulge on his hip was a firearm: a .45 caliber pistol. When asked if he had a permit for the pistol, Defendant first stated that he didn't need one, and then that he didn't have one. Youpel was able to confirm during the stop that Defendant did not have a California permit, but was unable to confirm whether Defendant had a New York permit.

Once they were done discussing the pistol, Youpel asked if there were any other firearms inside the vehicle. Defendant advised that there was a shotgun and a rifle in the trunk. At this point, Youpel called for backup and decided to remove Defendant from the vehicle. Youpel first retrieved the pistol from Defendant's hip and secured it in his police cruiser. Youpel then returned to the vehicle, asked Defendant to exit, and placed Defendant in handcuffs. Defendant was read his Miranda rights and consented to a search of the vehicle. Youpel then proceeded to search Defendant's vehicle.

In the backseat, Youpel found two military-style bags containing camping gear and clothes. In the trunk, Youpel discovered a Mossberg shotgun and an AR-style rifle rolled into a blanket. He also found an armor plate carrier and body armor, rounds for all three firearms, gloves, a flashlight, and a full medical kit.

Youpel removed the AR-style rifle from the trunk and inspected it for a serial number. This was part of his normal procedure to determine whether the firearm was stolen. When he looked to the area of the rifle where the serial number should have been located, he found nothing. Defendant was questioned about the rifle and he advised that it had been made by a friend of his. Defendant had no comment about the lack of a serial number. Defendant also did not answer when asked whether the rifle was semi or fully automatic.

After making a call to the ISP legal department to determine what, if any, crimes had been committed, Youpel arrested Defendant on three charges: carrying a handgun without a license; obstruction or defacing of a serial number on a firearm; and possession of body armor while committing a felony. Youpel also issued a warning for unsafe lane movement in violation of Ind. Code § 9-21-8-24. On cross-examination, Youpel admitted that Defendant did not actually violate this statute but advised that "local prosecutors" told the ISP to use this statute when writing citations for lane movement violations. Federal law enforcement later determined that the serial number and body armor charges were also erroneous. The final charge, carrying a handgun without a license, was dismissed with prejudice.

**B.     Legal Analysis**

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. Generally, the decision to stop a car is reasonable, and comports with the Fourth Amendment, "where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). Probable cause exists when "the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense." *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000). Probable cause is an objective standard, based on the totality of the circumstances. *United*

*States v. Lewis*, 920 F.3d 483, 489 (7th Cir. 2019). If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient basis to pull him over without violating the Constitution. *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005).

Defendant seemingly understands that, if Youpel is believed, then the stop was legal. Accordingly, he attacks Youpel's credibility, asserting that "the Court should find [Youpel's] contradictory version of events incredible." (ECF No. 80 at 16). In evaluating a witness' credibility, the Court must consider the entirety of the circumstances, including "the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, as well as confused or nervous speech patterns." *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002) (quoting *United States v. Mancillas*, 183 F.3d 682, 701 n.22 (1999)).

This Court previously indicated that it had "grave concerns" about Youpel's credibility. (*See* ECF No. 70 at 5). Having now reviewed the entirety of the transcript and considering the parties' briefs, the Court now conclusively finds that Youpel's testimony is not worthy of belief. While there is nothing inherently incredible about his version of events, the totality of the circumstances convinces the Court that Youpel's testimony is more likely an after-the-fact rationalization for the traffic stop than an accurate recounting of facts.

The parties focus on specific instances of testimony in discussing Youpel's credibility, but the Court bases its conclusion, in large part, on Youpel's radical change between direct and cross-examination. It is hard to overstate the efforts to which Youpel went on direct examination to make himself seem a well-educated, detail-oriented law enforcement officer. When Youpel wasn't referring to landmarks by specific mile markers, he was referring to them by *tenths of a mile*. (*See* ECF No. 81 at 11, 13, 40). He spent pages of the record recounting his educational and training

background. (*Id*. at 8–10). He cited the statutorily required signal distance unprompted. (*Id*. at 15). He testified to specific facts regarding the outline that the firearm made in Defendant's t-shirt (*id*. at 18), the color of Defendant's knuckles as he was gripping the steering wheel (*id*. at 19), the position of the hammer on Defendant's pistol (*id.* at 22), and the number of guns registered to Defendant in California (*id*. at 23), among other specific details. When answering AUSA Nokes' questions, then, Youpel exhibited a nearly photographic memory of the events surrounding the stop.

Compare that testimony to the testimony given on cross-examination. Youpel could not remember when he first spotted Defendant's vehicle (*id*. at 38), where he was when he observed Defendant make the first lane change (*id*. at 43), whether the safety was engaged on the pistol (*id*. at 64), where he was when he observed Defendant make the second lane change (*id*. at 81), and how long he had been on probationary status at the time of the stop (*id*. at 82). Most of these instances have been discussed by the parties, but the most conclusive bit of testimony is one that was not discussed by either party in the briefs.

No single piece of testimony demonstrates Youpel's transformation more than his discussion of interstate reciprocity for firearm permits. Consider the following:

> Q.   Okay. Now, does Indiana give reciprocity for gun licenses to residents of California or New York?
>
> A.   We do not.
>
> Q.   So whether he had a permit or not wouldn't have made a difference then?
>
> A.   (No audible response.)
>
> Q.   You would have arrested him for the gun charge, possessing a firearm without a license, whether California said he had a permit or New York said he had a permit, because Indiana doesn't give them reciprocity, right?
>
> A.   I have to look. Is that asking if we accept those licenses?

> Q. You already said Indiana doesn't, and I know that's accurate. So my question is: Telling us, with no physical evidence to back it up, that you waited to physically arrest him until you knew he didn't have a license in Indiana - - or I'm sorry, didn't have a license in California or New York didn't matter, because those licenses wouldn't have been honored in Indiana anyhow, correct?
>
> A. I do not know. I'd have to look.
>
> Q. You told me 2 minutes ago that Indiana didn't give reciprocity to California or New York.
>
> A. I don't know what that means, "reciprocity."

(ECF No. 81 at 50–51). In the course of less than a page, Youpel goes from intelligently discussing interstate reciprocity for firearm permits to **denying he knows what the term reciprocity means**. Not only is this quick turnaround incredible, it is ridiculous to the point of being insulting.

But what the transcript doesn't capture was the look on Youpel's face during this back and forth. At the point where the record states "no audible response," you could see the gears turning in Youpel's head. He looked surprised and concerned that his rationale for prolonging the traffic stop had been called into question. To rectify the situation, Youpel would have had everyone in the courtroom believe that an individual with eight months of law enforcement academy training, in addition to "a hundred hours, at least" of yearly training in areas related to state and federal firearms laws, didn't understand basic legal terminology. The Court doesn't buy it and finds Youpel's lack of credibility on this point "casts an entirely different light on [Youpel's] convenient collective lack of recollection" on cross examination. *United States v. Whitley*, 249 F.3d 614, 624 (7th Cir. 2001).

To save Youpel's testimony, the Government cleverly attempts to turn Youpel's sudden lack of recollection into a positive. The Government explains that Youpel doesn't remember specific facts because "this traffic stop was routine," and "Youpel had no bias or personal animus

against" Defendant. (ECF No. 84 at 28, 29). These statements make perfect sense in the abstract, but not when applied to Youpel. The Government can't have it both ways: Youpel can't have perfect recollection of the facts that would form a violation of Indiana law but forget everything else. This was either an incident that Youpel remembers or it isn't. The Court believes the latter.

In comparison, the Court found Defendant credible. The Government is correct that Defendant could not remember any number of mundane details of his trip, but the stop was not a mundane detail. The feeling one has when they see a police officer on the highway is one that anyone with a driver's license knows well. It turns habitual traffic violators into driver's training instructors: the speed limit suddenly becomes sacrosanct, every move is proceeded by a turn signal, tailgating turns into comfortable distances between vehicles. With Youpel driving a fully marked ISP cruiser, the Court finds eminently believable Defendant's statement that he treated the trooper's presence with great caution, using his turn signal for an excessive period. Nothing in Defendant's inability to pinpoint his gas stops changes the Court's analysis.

The Court also believes that the rationale for the stop posited by the Defendant is the most likely. Youpel patrolled a well-known drug corridor.[2] He saw an out-of-state vehicle traveling late at night, with a lone male occupant. He likely suspected some manner of drug activity. Armed with a vague Indiana statute addressing lane movement (which, again, he had been instructed to use regardless of its applicability), he took the chance that he could convince a court that some minor traffic violation occurred. It did not work in this case and it should not be tried in the future.

"Evidence seized as a result of an illegal stop is the fruit of the poisonous tree and should not be introduced into evidence." *United States v. Wilbourn*, 799 F.3d 900, 910 (7th Cir. 2015).

---

[2] *See*, *e.g.*, Amy Lavalley, *Grant to fund full-time Porter County drug interdiction unit*, Chicago Tribune, April 10, 2019, https://www.chicagotribune.com/suburbs/post-tribune/ct-ptb-porter-drug-program-st-0411-story.html (noting that additional forces would be devoted to the Toll Road because "that's mainly where drug trafficking is happening").

So it is here. The SBR, the statements made during the custodial interrogation, and the information found on Defendant's cell phone were all seized and/or discovered as a result of a traffic stop that was illegal *ab initio*. Accordingly, all evidence so seized must be suppressed.

**C.     Conclusion**

For the foregoing reasons, Defendant's Motion to Suppress Regarding Stop of Automobile (ECF No. 28) is GRANTED. Defendant's Motion to Suppress Alleged Statements Obtained in Violation of Defendant's Rights Under *Miranda v. Arizona* and Related Constitutional Guarantees (ECF No. 29) and Motion to Suppress Evidence Seized as a Result of Executing Warrant on Defendant's Phone (ECF No. 32) are DENIED AS MOOT.

SO ORDERED on June 14, 2021.

    s/ Holly A. Brady
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT